**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE DELL TECHNOLOGIES INC. ) Consol. C.A. No. 2018-0816-JTL
CLASS V STOCKHOLDERS LITIGATION )

**OPINION ON FEE AWARD AND INCENTIVE AWARD**

Date Submitted: April 19, 2023
Date Decided: July 31, 2023

Ned Weinberger, Mark Richardson, Brendan W. Sullivan, Casimir O. Szustak, LABATON SUCHAROW LLP, Wilmington, Delaware; Dominic Minerva, Joseph Cotilletta, Nathaniel Blakney, LABATON SUCHAROW LLP, New York, New York; David M. Cooper, Silpa Maruri, Dominic J. Pody, George T. Phillips, Christine J. Chen, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; William C. Price, William R. Sears, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Co-Lead Counsel for the Plaintiff Class.*

Peter B. Andrews, Craig J. Springer, Christopher P. Quinn, David M. Sborz, Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Chad Johnson, Noam Mandel, Desiree Cummings, Robert Gerson, Jonathan Zweig, ROBINS GELLER RUDMAN & DOWD LLP, New York, New York; Jeremy S. Friedman, David F.E. Tejtel, Christopher M. Windover, Lindsay La Marco, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Additional Counsel for the Plaintiff Class.*

John D. Hendershot, Susan M. Hannigan Cohen, Kyle H. Lachmund, Angela Lam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Cara M. Peterman, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Counsel for Defendants Michael Dell, Egon Durban, and Simon Patterson.*

Martin S. Lessner, Elena C. Norman, James M. Yoch, Jr., Lauren Dunkle Fortunato, Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; James G. Kreissman, Stephen P. Blake, David Elbaum, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendant Silver Lake Group LLC.*

Michael A. Barlow, April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michele D. Johnson, Kristin N. Murphy, Ryan A. Walsh, LATHAM & WATKINS LLP, Costa Mesa, California; *Counsel for Defendants William Green and David Dorman.*

Edward B. Micheletti, Arthur R. Bookout, Jessica R. Kunz, Peyton V. Carper, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendant Goldman Sachs & Co., LLC.*

Stephen B. Brauerman, Sarah T. Andrade, BAYARD, P.A., Wilmington, Delaware; *Counsel for Objector Pentwater Capital Management L.P.*

Anthony A. Rickey, MARGRAVE LAW LLC, Wilmington, Delaware; *Counsel for Law Professors Participating as Amici Curiae.*

**LASTER, V.C.**

The plaintiff settled this class action on the eve of trial in exchange for the defendants' agreement to pay $1 billion in cash. The "b" is not a typo. It is the largest cash recovery ever obtained by a representative plaintiff in this court.

Plaintiff's counsel seek an all-in award of attorneys' fees and expenses equal to 28.5% of the common fund. They ask for permission to pay an incentive award of $50,000 to the plaintiff. The defendants agreed not to oppose those requests.

A 28.5% award falls within the guideline range of percentages for a late-stage settlement under the framework that the Delaware Supreme Court endorsed in *Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). The *Americas Mining* decision instructs that when a plaintiff has obtained a quantifiable result, the court should derive an indicative fee award as a percentage of the result. To determine the percentage, the court considers the stage of the case when the result was obtained. A court awards a higher percentage when plaintiff's counsel has pushed deeper into the case, which rewards plaintiff's counsel for taking more risk in pursuit of the best outcome. The stage-of-case approach helps counteract the natural human tendency toward risk aversion and gives plaintiff's counsel an incentive to eschew an early, lower-valued settlement.

Providing that incentive is important. Delaware's experience during the M&A litigation epidemic demonstrated that entrepreneurial counsel can profit by filing weak cases on an industrial scale, putting in minimal work, and settling by offering defendants a global release in return for no-cost or low-cost relief plus an agreement not to oppose an attorneys' fee award. That business model worked for everyone directly involved: Entrepreneurial counsel got paid, defense counsel got paid, and the defendants got a

release. It only harmed absent class members (who got bupkus), the courts (who had to process the non-litigation litigation), and society as a whole (because real claims were not litigated, and transactional standards deteriorated when the cases always settled anyway). By awarding fees in those cases, the court may well have contributed to the harm that they caused.

The stage-of-case method helped fix that. Viewed in context, *Americas Mining* was an early salvo in Delaware's multi-pronged response to the M&A litigation epidemic, which included changes to the substantive law in *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (subsequent history omitted), *C&J Energy Services, Inc. v. City of Miami General Employees*, 107 A.3d 1049 (Del. 2014), and *Corwin v. KKR Financial Holdings, LLC*, 125 A.3d 304 (Del. 2014), plus a tightening of the standards for disclosure-only settlements in *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884 (Del. Ch. 2016). The Chancellor recently took another salutary step along the same path in *Anderson v. Magellan Health, Inc.*, --- A.3d ---, 2023 WL 4364524 (Del. Ch. July 6, 2023).

Delaware's response recognizes that our entity law depends on private litigation for enforcement. Entrepreneurial plaintiff's counsel therefore perform a valuable service by pursuing litigation in a world where stockholders are rationally apathetic. Plaintiff's counsel deserves to be well compensated for identifying real cases, investing real money in those cases, and obtaining real results. But the law should not reward plaintiff's counsel for filing weak cases and obtaining insubstantial results.

In this case, plaintiff's counsel brought a real case, invested over $4 million of real money, and obtained a real and unprecedented result. Rather than requesting an

2

unprecedented fee award, plaintiff's counsel asked for 28.5% of the common fund, consistent with *Americas Mining*.

But 28.5% of $1 billion is $285 million. That is a big fee, and it would match the largest fee that this court has ever awarded: the $285 million fee award that the Delaware Supreme Court affirmed in *Americas Mining*.

A group of eight investment funds thinks that $285 million is too much. They argue that the court should reduce the percentage of the benefit awarded as the size of the common fund increases. The declining-percentage method seeks to mitigate a perceived problem of windfall profits. It assumes that it takes a relatively constant amount of work to litigate a case, so awarding the same percentage for a larger benefit risks overcompensation. Scholars have shown that the federal courts use a declining-percentage method in securities law cases and that for settlements of $1 billion or more, the prevailing trend is to award a fee of approximately 10-12%.

The funds have a strong economic motivation for seeking a lower fee award. They collectively own shares comprising 26.1% of the class. Although they did not propose an alternative amount, if the court were to follow the federal trend and award a 10% fee, the objectors would receive another $49 million.

After the court asked whether there was any academic learning on the declining-percentage method, five law professors appeared as *amici curiae*. They make the same arguments as the objectors, but they propose a 15% fee. If the court were to adopt that figure, the objectors would receive another $35.78 million.

3

The declining percentage method runs counter to *Americas Mining* and the incentive structure that the Delaware Supreme Court created. In practice, the declining-percentage method represents a covert return to the lodestar method, but one that works in the opposite direction. Under the lodestar method, the court starts from a fee based on time billed at customary hourly rates, then applies a multiplier to increase the award to a level that the judge feels appropriately compensates counsel for risk. Under the declining-percentage version, the court starts with a percentage-based fee, then reduces the award to a level where the judge feels that the multiplier does not excessively compensate counsel for risk.

In *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980), the Delaware Supreme Court rejected the lodestar method in favor of the percentage-of-benefit method. In *Americas Mining*, the Delaware Supreme Court underscored that choice by adopting the stage-of-case method. It would not make sense to return covertly to the lodestar method.

Delaware law deals with the problem of overcompensation differently. In *Sugarland*, the Delaware Supreme Court identified a list of factors for a court to consider when determining a reasonable award. The inquiry starts with a percentage of the benefit conferred with the percentage selected from ranges that correspond to the stage of the case. But the inquiry does not end there. The court also considers the extent to which counsel litigated on contingency, the time and effort counsel invested, the relative complexity of the litigation, and the standing and ability of counsel. The court can rely on those other factors to adjust the indicative fee upward or downward. The Delaware Supreme Court made clear in *Americas Mining* that a court can reduce an excessive fee, but that analysis

4

happens using the *Sugarland* factors. It does not happen because of a declining-percentage methodology.

This decision hews to *Americas Mining* and *Sugarland*. After considering precedents involving late-stage, pre-trial settlements, this decision starts with an indicative fee equal to 26.67% of the common fund, or $266.7 million. None of the other *Sugarland* factors warrant an upward or downward adjustment. Plaintiff's counsel is entitled to an all-in award of $266.7 million. From that amount, plaintiff's counsel will pay an incentive award of $50,000 to the plaintiff.

## I. FACTUAL BACKGROUND

The facts are drawn from the record presented in connection with the settlement. Additional factual detail appears in the legal analysis.

### A. The Transaction

In 2013, Michael Dell and Silver Lake Group LLC took Dell, Inc. private in a management buyout. The acquirer and privately held successor to Dell, Inc. is Dell Technologies Inc. (the "Company"). Dell and Silver Lake control the Company.

In 2016, the Company sought to acquire EMC Corporation. That acquisition would bring with it EMC's ownership of 81.9% of the equity of VMware, Inc., another publicly traded corporation. Dell and Silver Lake wanted to pay cash, but the Company remained highly leveraged after the management buyout and could not fund an all-cash deal. So the Company proposed to acquire EMC using a combination of cash and newly authorized shares of Class V common stock, which would trade publicly and ostensibly track the performance of VMware common stock on a share-for-share basis.

The Company and EMC ultimately completed a transaction that valued EMC at $67 billion. Each share of EMC common stock was converted into the right to receive $24.05 in cash plus 0.11146 of a Class V share. The Company listed the Class V shares on the New York Stock Exchange where they traded under the symbol "DVMT."

DVMT was billed as the "highest quality tracker in the history of trackers." Investment bankers predicted that DVMT would trade at little to no discount relative to VMware's common stock.

They were wrong. DVMT traded at a discount of 30-50% to VMware's publicly traded shares. One reason for the discount was that the Company had the option to forcibly convert the DVMT shares into Class C shares using an opaque and manipulable formula.

After completing the EMC acquisition, Dell and Silver Lake began to explore ways of capturing the value of the DVMT discount by consolidating the Company's ownership of VMware. The Company retained Goldman Sachs & Co. for advice. There were three obvious paths: (i) a transaction with VMware, (ii) a negotiated redemption of the DVMT shares, or (iii) a forced conversion.

Goldman advised that the Company could widen the DVMT discount by creating uncertainty about whether and when the Company would engage in a forced conversion. In late January 2018, the financial press reported that the Company was considering an IPO of its Class C stock, which was a precursor to a forced conversion. DVMT's stock price fell 6.4%, and the DVMT discount increased to 45.6%.

Shortly after those reports, the Company's board of directors created a special committee to negotiate a redemption of the DVMT shares. The committee was not

6

authorized to block an IPO of the Class C stock or a forced conversion. The members of the committee all had close ties to Dell or Silver Lake.

Over the next three months, the Company and its advisors threatened the committee and the DVMT stockholders with alternatives to a negotiated redemption. The committee negotiated in the shadow of those threats, eventually agreeing to a redemption which valued the DVMT shares at $109 per share. That price represented a 32.7% discount to VMware's trading price.

Holders of DVMT stock objected, and the Company did not believe that the DVMT stockholders would approve the deal. Rather than negotiating further with the committee, the Company began negotiating with six investment funds. The Company entered into non-disclosure agreements with the funds to keep them siloed and deployed a divide-and-conquer strategy. Meanwhile, the Company continued to prepare for a forced conversion.

After four-and-a-half months, the Company reached an agreement with the stockholder volunteers. Each holder of DVMT stock could opt to receive (i) shares of newly issued Class C common stock valued at $120 per share, or (ii) $120 per share in cash, with the aggregate amount of cash capped at $14 billion. The new deal valued the DVMT stock in the aggregate at $23.9 billion.

On November 14, 2018, the Company informed the committee of the terms of the transaction. The committee met for an hour and approved it.

During a special meeting of the DVMT stockholders on December 11, 2018, the transaction received approval from unaffiliated holders of 61% of the issued DVMT shares. Two weeks later, the transaction closed.

7

**B.      This Litigation**

After the announcement of the initial committee-approved redemption, plaintiff Steamfitters Local 449 Pension Plan made a books and records demand. Its counsel filed a putative class action on behalf of the DVMT stockholders. Four similar actions were filed.

The five actions were consolidated, and the lawyers organized themselves into two groups who competed to lead the lawsuit. The court appointed the plaintiff and its counsel. Labaton Sucharow LLP and Quinn Emanuel Urquhart & Sullivan, LLP served as co-lead counsel. Robins Geller Rudman & Dowd LLP, Friedman Oster & Tejtel PLLC, and Andrews & Springer LLC served as additional counsel.

Plaintiff's counsel filed an amended complaint, and the defendants moved to dismiss it. Plaintiff's counsel filed a second amended complaint, and the defendants moved to dismiss again. After full briefing and argument, the court largely denied the defendants' motion, although it dismissed the claims against one director. *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748 (Del. Ch. June 11, 2020).

For the next two-and-a-half years, the parties litigated. In February 2021, while fact discovery was ongoing, the parties stipulated to class certification, and the court approved the certification order. The parties completed fact discovery, then expert discovery. In September 2022, after expert discovery closed, the parties participated in a full-day mediation. They did not reach a settlement.

The two sides prepared for trial, which was scheduled to begin on December 5, 2022. Fourteen fact witnesses and three expert witnesses planned to testify live.

At the end of October 2022, the parties filed a fifty-one-page joint pre-trial order and identified 2,887 joint trial exhibits. On November 7, the parties filed lengthy pretrial briefs.

## C.    The Settlement

After the pre-trial briefs were filed, the mediator asked the parties to consider a mediator's proposal. They agreed, and the mediator proposed a settlement for $1 billion in cash. Both sides accepted, subject to documentation and court approval. Counsel contacted the court and removed the trial from the calendar. After the parties filed a settlement stipulation, the court scheduled a hearing to consider the settlement and an application for an award of fees and expenses. Notice went out to the former DVMT stockholders.

No one objected to the settlement. Pentwater Capital Management L.P. ("Pentwater") filed an objection to the fee application. Dkt. 518 (the "Objection"). Pentwater owned DVMT shares comprising approximately 1.6% of the class. Seven other investment funds[1] joined in the Objection. They collectively owned shares comprising another 24.45% of the class.

The objectors took issue with the "sheer enormity of the fees sought" and claimed that the award would be "far in excess of what is appropriate in these circumstances." *Id.* at 2. They proposed that "[r]ather than basing the attorneys' fee award here on a strict

---

[1] The seven other funds are Alpine Associates Management Inc.; Canyon Capital Advisors LLC; Carlson Capital, L.P.; Dodge & Cox; Farallon Capital Management, L.L.C.; Icahn Capital LP; and P. Schoenfeld Asset Management L.P.

percentage of the Settlement Fund," the court should apply "a declining percentage approach." *Id.* The objectors did not propose a particular percentage or suggest a reasonable award.

The court responded with a letter to all of the parties, including the objectors. The court expressed appreciation for the objectors' input and asked all of the parties to provide three additional categories of information.

First, the court noted the objectors had not cited any scholarship about fee awards in mega-fund cases. The court asked whether law professors had anything to say in favor of or against the declining-percentage method.

Second, the court noted that the objectors did not discuss how privately negotiated contingency fee arrangements address large recoveries. The court asked the parties to provide information on that topic.

Third, the court asked for information on the objectors' own compensation arrangements, explaining:

> [I]t occurred to me that the investment managers you represent likely have compensation arrangements that provide for both an annual management fee and a performance fee. The familiar 2-and-20 formula is an example. When a fund achieves gains that result in a performance fee coming due, is the performance fee reduced as the gains increase? In other words, do the investment managers for the objecting funds structure their own incentive compensation in the way that they propose for plaintiffs' counsel?

Dkt. 520 at 2. The court noted that

> because an investment manager receives an annual management fee equal to 2% of assets under management, which lets the managers keep the lights on and pay the employees while swinging for the gains that generate performance fees, the investment managers would seem to be in a less risky

10

position than plaintiffs' counsel, who lack a comparable annual fee component.

*Id.* at 2–3. The court asked the objectors to provide information about their annual management fees and performance fees, as well as any hurdle rates or other features that would affect the level of risk that the fund managers undertook.

One week after the court sent its letter, five law professors sought leave to participate as *amici curiae*.[2] Law professors do not generally monitor the court's docket so closely, and it seems likely that the objectors recruited them. The court granted the professors leave to participate and is grateful for their input.

The objectors filed a supplemental submission, and the professors filed their brief. The professors' positions on how the court should proceed tracked the objectors' point of view, with the professors serving as *de facto* experts for the objectors. Other distinguished scholars recommend different approaches for calculating fee awards, but none of those scholars appeared as *amici curiae*. The plaintiff filed its reply in support of the settlement, fee award, and incentive award.

---

[2] The professors are (in alphabetical order) Benjamin Edwards, Associate Professor of Law at the William S. Boyd School of Law of the University of Nevada, Las Vegas; Jessica M. Erickson, the Nancy Litchfield Hicks Professor of Law at the University of Richmond School of Law; Sean J. Griffith, the T.J. Maloney Chair in Business Law at the Fordham University School of Law; Joseph A. Grundfest, Senior Faculty at the Arthur and Toni Rembe Rock Center for Corporate Governance of Stanford Law School; and Adam C. Pritchard, the Frances and George Skestos Professor of Law at the University of Michigan Law School.

On April 19, 2023, the court held a hearing to consider the settlement. After hearing argument, the court approved the settlement. The court took the fee application under advisement.

## II. LEGAL ANALYSIS

Plaintiff's counsel seek an all-in award of fees and expenses equal to 28.5% of the common fund, resulting in a total award of $285 million. Plaintiff's counsel seek permission to pay an incentive award of $50,000 to the plaintiff. The defendants agreed not to oppose those requests. The objectors and the professors oppose the fee award. No one objects to the incentive award.

### A. The Fee Award

The power to award fees to counsel for creating a common benefit, such as a common fund, "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations." *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1166 (Del. 1989). When awarding fees, the court does not defer to what the defendants agreed not to oppose. The court "must make an independent determination of reasonableness." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1046 (Del. 1996).

The *Sugarland* decision governs how a court awards fees in representative actions. That decision identified factors to consider when awarding fees, but the factors appeared diffusely throughout the opinion. *See Sugarland*, 420 A.2d at 149–50. In *Americas Mining*, the Delaware Supreme Court summarized them as follows: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." 51 A.3d at 1254.

12

The primary factor is the results achieved. If the results are quantifiable, then "*Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Id.* at 1259. "Hours worked are considered as a crosscheck to guard against windfall awards, particularly in therapeutic benefit cases." *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011). "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case." *Id.* "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike." *Id.*

### 1.    The Benefit Created By Counsel's Efforts

The primary factor in calculating a fee award is the benefit created by counsel's efforts. The causal dimension is critical, because Delaware public policy calls for compensating counsel "for the beneficial results they produced." *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980). Counsel cannot take credit for results they did not produce, so a court must consider "whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof." *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005). Sometimes, a result will stem from multiple causes, and the court must assess "the degree of causation between counsel's efforts and the result when awarding reasonable attorneys' fees." *Smith v. Fid. Mgmt. & Rsch. Co.*, 2014 WL 1599935, at *11 (Del. Ch. Apr. 16, 2014). If counsel did not cause the full headline benefit, then the court must reduce the value of the benefit to match the extent of counsel's role. *See id.* at *13–15. Although causation is not at issue in this case, it was at issue in some of

13

the precedents on which the objectors rely, and the objectors' failure to consider causation leads them to erroneous conclusions.

When the value of the benefit is quantifiable, *Americas Mining* calls for calculating an indicative fee as a percentage of the benefit. 51 A.3d at 1259. Other *Sugarland* factors may cause the court to adjust the indicative fee up or down, but the starting point under *Americas Mining* is a percentage calculation. Under this method, the "common fund is itself the measure of success." *Id.* "A percentage of a low or ordinary recovery will produce a low or ordinary fee; the same percentage of an exceptional recovery will produce an exceptional fee." *In re Orchard Enters. Inc. S'holder Litig.*, 2014 WL 4181912, at *8 (Del. Ch. Aug. 22, 2014). "The wealth proposition for plaintiffs' counsel is simple: If you want more for yourself, get more for those whom you represent." *Id.*

In this case, there is an obvious and self-quantifying benefit in the form of $1 billion in cash. There is no reason to look for sufficiently reliable proxies to price non-monetary relief. *Cf. In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) (identifying proxies for that purpose). Plaintiff's counsel was the sole cause of the benefit: But for the litigation, the benefit would not exist. No other causal factor contributed to the outcome.

Because the benefit is quantifiable, *Americas Mining* calls for calculating an indicative fee award as a percentage of the benefit. Plaintiff's counsel seeks an indicative fee calculated using the stage-of-case method from *Americas Mining*. The objectors and professors argue for using the declining-percentage method from federal securities class actions. They also advance other arguments in support of a reduced percentage.

14

### a. The Stage-Of-Case Method

In *Americas Mining*, the Delaware Supreme Court endorsed the practice of setting the percentage for the indicative fee using the stage of the case when the result was reached. 51 A.3d at 1259–60. Awarding increasing percentages as counsel pushes deeper into a case ensures that counsel's incentives remain aligned with the case. A widely acknowledged conflict exists between the incentives of class and counsel:

> The plaintiff's financial interest is in his share of the total recovery less what may be awarded to counsel, *simpliciter*; counsel's financial interest is in the amount of the award to him less the time and effort needed to produce it. A relatively small settlement may well produce an allowance bearing a higher ratio to the cost of the work than a much larger recovery obtained only after extensive discovery, a long trial and an appeal.

*Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972) (Friendly, C.J.). "When the lawyer gains 40 cents to the client's dollar, the lawyer tends to expend too little effort . . . . [H]e would not put in an extra $600 worth of time to obtain an extra $1,000 for his client, because he would receive only $400 for his effort." *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) (Easterbrook, J.).

Scholars who have long studied this conflict recommend awarding an increasing percentage of the benefit as a corrective measure.[3] Awarding an increasing percentage of

---

[3] Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004). For now-classic treatments of this problem, see Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. Legal Stud. 189, 198–202 (1987); Kevin M. Clermont & John D. Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529, 543–46 (1978); Murray L. Schwartz & Daniel J.B. Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation*, 22 Stan. L. Rev. 1125, 1133–39 (1970).

the benefit "is at best a rough corrective . . . because it substitutes a small number of discrete increments for what is in fact a continuous process — the reduction in the attorney's expected future costs as the case progresses." Miller, *supra*, at 201. It nevertheless "partially mitigates the attorney-client conflicts." *Id.* at 201–02.

Awarding a percentage that increases as the case progresses also counteracts a natural human tendency toward risk aversion. "For plaintiffs' counsel, risk aversion manifests itself as a natural tendency to favor an earlier bird-in-the-hand settlement that will ensure a fee, rather than pressing on for a potentially larger recovery for the class at the cost of greater investment and with the risk of no recovery." *Orchard*, 2014 WL 4181912, at *8. "The promise of a larger potential share of the benefit nudges representative counsel's incentives towards greater alignment with the class or entity on whose behalf they are litigating." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1071 (Del. Ch. 2015).

Delaware's experience during the M&A litigation epidemic confirms this.[4] Some plaintiff's lawyers pursued business models that involved filing cases indiscriminately

---

[4] For discussions of the M&A litigation epidemic from different perspectives, see *Magellan*, 2023 WL 4364524, at *7–9 (judicial perspective); Edward B. Micheletti & Jenness E. Parker, *Multi-Jurisdictional Litigation: Who Caused This Problem, and Can It Be Fixed?*, 37 Del. J. Corp. L. 1, 6–14 (2016) (practitioners who primarily represent defendants); Joel Edan Friedlander, *How* Rural/Metro *Exposed the Systemic Problem of Disclosure Settlements*, 40 Del. J. Corp. L. 877, 879–904 (2016) (practitioner who has represented plaintiffs and defendants); Mark Lebovitch & Jeroen van Kwawegen, *Of Babies and Bathwater: Deterring Frivolous Stockholder Suits Without Closing the Courthouse Doors to Legitimate Claims*, 40 Del. J. Corp. L. 491, 493, 509–23 (2016) (practitioners who represent plaintiffs); Jill E. Fisch, Sean J. Griffith & Steven Davidoff

against virtually every transaction. They settled those cases quickly, typically for supplemental disclosures and a fee. Sometimes they obtained other easy gives, such as a reduction in the termination fee after it was obvious that no overbidder would emerge. By contrast, other lawyers rejected a cookie-cutter approach, choosing instead to pursue real cases, develop case-specific theories, invest real effort, and generate real results.[5] The challenge for the courts was to reward the latter business model and not the former.

*Americas Mining* took an initial step by endorsing the stage-of-case method. After surveying a range of precedents, the Delaware Supreme Court observed that "Delaware case law supports a wide range of reasonable percentages for attorneys' fees, but 33% is the very top of the range of percentages." *Ams. Mining*, 51 A.3d at 1259 (internal quotation marks and citation omitted). That level of fee award is reserved for a plaintiff who prevails after trial.

For cases that do not go the distance to a post-trial adjudication, the Delaware Supreme Court provided guideline percentages:

> When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple

Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557, 557–72 (2015) (law professors).

[5] *See* Friedlander, *supra*, at 904–10 (describing "two-tier plaintiff bar"); *see also* Joel Edan Friedlander, *Vindicating the Duty of Loyalty: Using Data Points of Successful Stockholder Litigation As A Tool for Reform*, 72 Bus. Law. 623, 624–25 (2017) (identifying twelve examples of representative litigation that generated eight-to-nine-figure recoveries); Lebovitch & van Kwawegen, *supra*, at 528–33 (identifying five of the twelve).

depositions and some level of motion practice, fee awards in the Court of
Chancery range from 15–25% of the monetary benefits conferred. . . .

*Id.* at 1259–60 (internal quotation marks and citations omitted).

Selecting an appropriate percentage requires an exercise of judicial discretion. *Id.* at
1261. The test is not a mechanical one, but the use of guideline ranges promotes consistent
awards so that similar cases are treated similarly. Past precedents shape future behavior,
and a practice of rarely departing from guideline percentages helps create desirable
incentives.[6]

This case involved a late-stage settlement. The parties informed the court that they
had reached an agreement in principle on November 16, 2022. That was nineteen calendar

---

[6] The stage-of-case method is vulnerable to the criticism that it undercompensates
counsel who achieve everything they might have obtained after trial through an early-stage
settlement. Counsel can rightfully argue that they should not receive only 10% of a
recovery if they settled at an early stage for everything that the court could have awarded.
Counsel can also rightly argue that Delaware law should not provide incentives for over-
litigating a case. Those are valid points, and there always will be edge cases that put stress
on a system. The challenge for the court is to determine whether counsel achieved
everything that the court could have awarded—and to do so in the non-adversarial context
of a settlement hearing. One would think that degree of success would be rare. Defendants
usually do not settle up front for their maximum potential exposure, and there is a reason
why parties retain experts to calculate damages after the close of fact discovery, when
everyone has the most possible information about the case. It is also a short step from
seeking a higher percentage for achieving *everything* that counsel might have obtained to
seeking a higher percentage for achieving *most* of what counsel might have obtained. And
it is only another short step to seeking a higher percentage for achieving different relief
(such as therapeutic benefits) that counsel could not have obtained. Across most cases and
in most settings, the stage-of-case method creates salutary incentives to obtain the greatest
possible relief for the class. In a case where it is clear that counsel achieved *everything* that
they sought in their complaint, then perhaps an upward adjustment in the percentage might
be warranted, but that type of departure from the *Americas Mining* framework risks inviting
similar arguments in every case.

days before trial was scheduled to begin. The parties had submitted a fifty-three-page joint pre-trial order and filed their pre-trial briefs. Plaintiff's counsel filed a pre-trial brief that spanned 134 pages and contained 22,908 words. Plaintiff's counsel truly litigated until the eve of trial.

Plaintiff's counsel thus went beyond a mid-stage adjudication that should yield a fee of 15–25% ("multiple depositions and some level of motion practice") but stopped short of a full adjudication that would warrant an award of 33%. Plaintiff's counsel did not actually try the case, invest in post-trial briefing, or prepare for and make a post-trial argument. Most significantly, plaintiff's counsel did not accept the risk of an adverse post-trial outcome, and they did not confront the difficulty of defending a monetary judgment on appeal. That final challenge is significant: Since the *Americas Mining* decision in 2012, six cases have resulted in post-trial judgments awarding monetary damages in representative actions. The Delaware Supreme Court affirmed the first two, one in 2014[7] and the other in 2016.[8] The Delaware Supreme Court reversed the next four.[9] During the

---

[7] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015) (affirming award of $70 million to class of stockholders).

[8] *CDX Hldgs., Inc. v. Fox*, 141 A.3d 1037 (Del. 2016) (affirming award of $16 million to class of option holders). A dissenting justice would have reversed the liability finding. *See id.* at 1042 (Valihura, J., dissenting).

[9] *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083 (Del. 2022) (reversing post-trial judgment of $690 million for plaintiff class of limited partner investors); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund, Ltd.*, 177 A.3d 1 (Del. 2017) (reversing post-trial judgment awarding fair value of $17.62 per share to appraisal class comprising 5,505,730 shares, resulting in incremental value over deal price of $13.75

19

post-*Americas Mining* era, plaintiffs in representative actions who have prevailed at the

trial court level and recovered a monetary judgment have lost on appeal 67% of the time,

per share of $21.3 million (exclusive of interest)); *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017) (reversing post-trial judgment awarding fair value of $10.21 per share to appraisal class comprising 4,604,683 shares, resulting in incremental value over deal price of $9.50 per share of $3.2 million (exclusive of interest)); *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) (vacating post-trial judgment of $171 million to be implemented through investor-level remedy).

More recently, the Delaware Supreme Court affirmed a monetary damages award in favor of a class of minority partners, but it was the plaintiffs who took the appeal in pursuit of a larger damages award. The defendants did not contest the liability finding. *See Bell v. AT&T Mobility Wireless Operations Hldgs. LLC,* 2023 WL 3880120 (Del. June 7, 2023) (ORDER).

From one perspective, the outcome in *Aruba* could be viewed as a plaintiff's victory, because the Delaware Supreme Court increased the appraisal award from the unaffected market price to a value based on the deal-price minus synergies, but the fair value was still less than what the appraisal claimants would have obtained by accepting the deal consideration, so it was hardly a win for the appraisal class. *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128 (Del. 2019).

with a 100% reversal rate since 2016.[10] A plaintiff who takes a case to trial and prevails thus faces significant appellate risk.[11] A settlement renders that risk trivial.[12]

_____

[10] The increased reversal risk appears to be limited to cases in which representative plaintiffs recover money damages, as opposed to increasing across all cases. Outside of the world of money judgments, representative plaintiffs have fared better, notching three affirmances of post-trial judgments awarding non-monetary relief. *See CCSB Fin. Corp. v. Totta*, 284 A.3d 713 (Del. 2022); *Williams Cos., Inc. v. Wolosky*, 264 A.3d 641 (Del. 2021); *Austin v. Judy*, 65 A.3d 616 (Del. 2013). And outside of the world of representative plaintiffs, large investors have had success on appeal when litigating on their own. In 2019, the Delaware Supreme Court affirmed a judgment for $20.2 million (plus pre- and post-judgment interest) in favor of a large investor who purchased the corporation's claims from a receiver. *See Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (ORDER). The case was not a representative action, and the only defendant to appeal sought to represent himself, so it was not the most effective appellate challenge. The following year, the Delaware Supreme Court affirmed a judgment for $4.4 million in favor of another large investor, but that case was also brought by a single, large holder that was the sole investor in the fund. *See HOMF II Inv. Corp. v. Altenberg*, 268 A.3d 1013 (Del. 2021) (ORDER). Finally, defendants have enjoyed success on appeal. Since *Americas Mining*, there has been only one reversal of a post-trial judgment for the defendants in a representative action, and it was affirmed after the trial court reached the same conclusion on remand. *Compare Coster v. UIP Cos.*, 255 A.3d 952 (Del. 2021) *with Coster v. UIP Cos.*, --- A.3d ---, 2023 WL 4239581 (Del. June 28, 2023). Other post-trial judgments for defendants in representative actions have been affirmed. *E.g., In re Tesla Motors, Inc. S'holder Litig.*, --- A.3d ---, 2023 WL 3854008 (Del. June 6, 2023)*; Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020); *In re PLX Tech. Inc. S'holders Litig.*, 211 A.3d 137 (Del. 2019); *ACP Master, Ltd. v. Sprint Corp.*, 184 A.3d 1291 (Del. 2018).

[11] The degree of appellate risk appears to have shifted over time. Because this decision examines fee rulings during the *Americas Mining* era, that decision provides a convenient starting point for assessing appellate outcomes. Extending the date backwards to the turn of the millennium suggests that plaintiffs faced less appellate risk during that era, with the caution that during that period, few representative lawsuits were tried, fewer resulted in plaintiffs' victories, and still fewer were appealed. Between 2000 and the issuance of the *Americas Mining* decision, the Delaware Supreme Court affirmed three post-trial judgments awarding monetary relief to plaintiffs in one representative action. *See Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206 (Del. 2012); *William Penn P'ship v. Saliba*, 13 A.3d 749, 751 (Del. 2011); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d

21

The *Americas Mining* decision does not expressly provide a guideline range for a

late-stage settlement, so the parties have asked the court to look to precedent. The court

has considered eight cases:

- In *Mindbody*, the plaintiffs reached a partial settlement, six weeks before trial, with all but two defendants. The settlement created a gross common fund of $27 million. Counsel incurred expenses of $666,142.95 and asked for reimbursement plus a fee of $7.89 million, representing 30% of the net common fund. The court approved the request. *In re Mindbody, Inc. S'holder Litig.*, C.A. No. 2019-0442-KSJM, at 14, 17, 27–28, 33 (Del. Ch. June 8, 2022) (TRANSCRIPT).

- In *Riche v. Pappas*, the parties settled "just before trial." C.A. No. 2018-0177-JTL, at 23–24 (Del. Ch. Sept. 16, 2020) (TRANSCRIPT). The settlement created a gross common fund of $6.5 million. Counsel asked for a fee equal to 30% of the gross fund plus reimbursement of $250,760.81 in expenses from the common fund. The

---

437 (Del. 2000). In another representative action, the Delaware Supreme Court affirmed a finding of liability against the defendants but reversed the damages award as too conservative and remanded for consideration of whether the award should have included a control premium. *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160 (Del. 2002). The Delaware Supreme Court does not appear to have reversed any post-trial judgments awarding monetary damages to plaintiffs in representative actions in this era, although in one case the high court did so as a practical matter: The Delaware Supreme Court instructed the trial court to reconsider its rulings after excluding particular categories of evidence, the trial court reached a different conclusion on remand that eliminated the damages upside for the plaintiffs, and the Delaware Supreme Court affirmed that result on appeal. *AT&T Corp. v. Lillis*, 970 A.2d 166 (Del. 2009). Defendants had relatively less success on appeal than after *Americas Mining*. In one case, the Delaware Supreme Court reversed a post-trial judgment in favor of the defendants and remanded for further proceedings. *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522 (Del. 2011). In another, the Delaware Supreme Court brought to a close the sempiternal appraisal proceeding in *Technicolor* by directing the Court of Chancery to enter judgment using inputs that increased the value of the award. *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26 (Del. 2005). A set of appellate rulings during the 1990s or the 1980s would likely have different characteristics.

[12] The only path would be for an objector to challenge the settlement, then appeal from the trial court's decision approving the settlement. Such an appeal faces long odds.

22

court deducted the expenses first and granted a fee equal to 30% of the net common fund. *Id.* at 4, 12, 25–26.

- In *Starz*, the parties "litigated right up until the brink of trial." *In re Starz S'holder Litig.*, Consol. C.A. No. 12584-VCG, at 56 (Del. Ch. Dec. 10, 2018) (TRANSCRIPT). The settlement created a gross common fund of $92.5 million. Counsel incurred expenses of $1,689,816.76 and asked for a fee of $26,060,184, representing 28.17% of the net amount. The odd figure and counsel's comments suggest that they based their request on an all-in award equal to 30% of the gross amount. The court approved the award. *Id.* at 10, 56–57.

- In *Jefferies*, the parties settled five weeks before trial. The settlement created a gross common fund of $70 million, with any fee award to be paid separately. After considering the *Sugarland* factors, the court awarded $21.5 million, inclusive of $1 million in expenses. The court noted that the award equated to 23.5% of a gross common fund of $91.5 million. *In re Jefferies Gp., Inc. S'holders Litig.*, 2015 WL 3540662, at *2, *4 (Del. Ch. June 5, 2015).

- In *Activision*, the parties settled one month before trial. The settlement consisted of (i) a payment of $275 million to Activision, (ii) a reduction in the cap on the voting power wielded by Activision's two senior officers from 24.5% to 19.9%, and (iii) the expansion of Activision's board of directors to include two individuals unaffiliated with the two senior officers. The plaintiffs sought an award of $72.5 million, which the defendants agreed not to oppose. The court started from a guideline range of 22.5% to 25% for a late-stage settlement. After putting rough values on the non-monetary benefits, the court found that the requested fee fell between 22.7% and 24.5% of the benefit conferred, within the guideline range. Noting that a negotiated fee that falls within the range deserves some deference, the court approved the award. 124 A.3d at 1042, 1071, 1074–75.

- In *Orchard*, the parties settled two months before trial. The settlement created a common fund of $10,725,000. The plaintiffs asked for an all-in award of $2,810,671, equal to 30% of the fund. The court gave the plaintiff causal credit for a gross benefit of $9,368,904. Counsel incurred $132,000 in expenses. The court stated that "[w]hile there are outliers, a typical fee award for a case settling at this stage of the proceeding ranges from 22.5% to 25% of the benefit conferred." *Orchard*, 2014 WL 4181912, at *8. The court approved an all-in award of $2,250,000, representing 24% of the gross benefit. *Id.*

- In *Rural Metro*, the plaintiffs settled with all but one defendant "deep in the case, after full discovery, on the eve of trial." *In re Rural/Metro Corp. S'holders Litig.*, Consol. C.A. No. 6350-VCL, at 35 (Del. Ch. Nov. 19, 2013) (TRANSCRIPT). The settlement created a gross common fund of $11.6 million. Counsel incurred expenses of $1.3 million. Counsel requested a fee of $3.1 million, representing 30%

of the net settlement fund. *Id.* at 5. The court first deducted the expenses, then awarded a fee of $2.9 million, equal to 28% of the net fund. *Id.* at 36–37. The plaintiffs proceeded to trial against the remaining defendant, resulting in the post-trial judgment that the Delaware Supreme Court affirmed. *See RBC Cap.*, 129 A.3d at 879.

- In *TeleCorp*, a pre-*Americas Mining* case, the parties settled two weeks before trial. *In re TeleCorp PCS, Inc. S'holders Consol. Litig.*, C.A. No. 19260-VCS, at 24, 91 (Del. Ch. Aug. 20, 2003) (TRANSCRIPT). The settlement created a gross common fund of $47.5 million. Evidencing the type of stockholder litigation that prevailed at the time, there was extensive commentary about the unprecedented nature of a cash settlement. Plaintiff's counsel sought a fee award of $14.2 million plus expenses of approximately $600,000. After deducting expenses, the request equated to 35.5% of the common fund. The court approved an all-in award of $14.25 million, equal to 30% of the gross common fund. *Id.* at 24, 68–69, 91, 101.

In part because *Sugarland* is a multi-factor test, it is difficult to discern a pattern in these precedents. One curiosity is that the written decisions in *Jefferies*, *Activision*, and *Orchard* awarded lower percentages for eve-of-trial settlements than the five transcript rulings. Another curiosity is that *Activision* and *Orchard* contemplated a guideline range of 22.5% to 25% for late-stage settlements, which placed those settlements within the upper half of the *Americas Mining* range for mid-case settlements and created a significant gap of 8% between the top percentage available for a settlement and the maximum of 33% available for a final judgment. The five transcript rulings take a different approach in which late-stage settlements warrant a higher percentage than the upper bound of the range for a mid-case settlement. Two of the transcript rulings award 28%; three award 30%.

The transcript rulings point to a practice of awarding a higher percentage for a late-case settlement than for a mid-case settlement. Eight integers scale from the 25% upper bound for a mid-case settlement to the 33% maximum for a post-trial adjudication. A distinction should remain between the most that a plaintiff can achieve via settlement and

the percentage that a plaintiff can obtain for a post-trial adjudication.[13] As noted earlier, going the distance requires more effort, accepts the risk of receiving nothing after trial, and takes on the additional work and risk associated with an appeal. A late-stage settlement eliminates those issues. That suggests that the percentage awarded in a case that stops short of a fully litigated judgment should top out at 30%, leaving a range of 25% to 30% for a late-stage settlement.

A logical point to start the late-stage phase is after the end of expert discovery. Engaging in real litigation in an M&A case requires experts, and experts cost a lot. Once expert discovery has concluded, plaintiff's counsel will have incurred substantial amounts. That is also the point when trial preparation begins in earnest and where the tasks include negotiating the pre-trial order, preparing a pre-trial brief, and presenting any pre-trial motions. Then comes the trial itself and the tasks associated with that effort, such as preparing exhibits, working with witnesses, performing the stand-up trial work, and choreographing the audio-visual component. Finally, there is post-trial briefing and argument.

Here, plaintiff's counsel made it through approximately one-third of the late-stage tasks. That points to a baseline percentage of 26.67%, one-third of the way between 25% and 30%.

---

[13] *See TeleCorp*, *supra*, tr. at 103 ("I could see holding out the full measure of 33 to maybe 35 percent [so] that there's a promise actually if you go to trial, it will be at the highest end of the range."); *accord Brinckerhoff v. Tex. E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 395 (Del. Ch. 2010).

Plaintiff's counsel has asked for a percentage 28.5%. That figure is over two-thirds of the way between 25% and 30%. Plaintiff's counsel did not do two-thirds of the work called for during the final stage of a case. Plus, if plaintiff's counsel gets 28.5% in this case, it will be difficult to find room in the late-stage tier for a settlement that occurs during trial, or during post-trial briefing, or after post-trial argument. It is always uncomfortable to reduce a fee request when plaintiff's counsel has performed well, so the judicial urge would be to reward counsel by pushing the percentage for a late-stage settlement upward. That in turn would compress the relative reward for going the distance to a final adjudication. To reiterate, some step-up should exist for a post-trial adjudication.

Although it means reducing the percentage that plaintiff's counsel receives in this case for a precedent-setting settlement, the most justifiable percentage under *Americas Mining* is 26.67%. The fee calculation will start with that figure.

### b.     The Declining-Percentage Method

The objectors and the professors argue that a court should reduce the percentage that counsel receive as the size of the common fund increases. The supposed goal of this method is to avoid windfall compensation. It rests on the assumption that a case which generates a big recovery does not involve significantly more work, so rewarding plaintiff's counsel with the same percentage results in excess compensation. That perceived risk is particularly acute in mega-fund cases. There are multiple reasons to reject the declining-percentage approach.

### i. Delaware Precedent

Since *Americas Mining*, Delaware decisions have neither endorsed nor applied the declining-percentage method, whether in mega-fund cases or otherwise. The concept itself conflicts with *Americas Mining*, which calls for an increasing percentage as the plaintiff pushes deeper into the case. If layered onto the *Americas Mining* method, it would penalize counsel for seeking a larger recovery. Plaintiff's counsel could count on an increasing percentage for increased risk under *Americas Mining*, only to have the percentage cut if plaintiff's counsel achieved too much. Such an approach would disincentivize taking a case through trial.

The objectors nevertheless attempt to create the impression that Delaware precedent already supports the declining-percentage method. They surprisingly claim that "Delaware has accepted the 'judicial consensus that the percentage of recovery awarded should 'decrease as the size of the [common] fund increases.'" Obj. at 5 (quoting *Goodrich*, 681 A.2d at 1048). That is not so. The *Goodrich* case did not endorse the declining-percentage method, and the *Americas Mining* decision subsequently rejected both the objectors' interpretation of *Goodrich* and the argument that a trial court must decrease the percentage awarded in a mega-fund case.

*Goodrich* was not about the declining-percentage method, nor was it a mega-fund case. The parties agreed to a settlement that created a gross common fund of $3.3 million for aggrieved brokerage customers who submitted valid notices of claim, with both administrative expenses and any attorneys' fee to be deducted from the fund. The Court of Chancery approved the settlement and awarded a fee equal to one-third of the amounts

27

actually claimed by class members, up to a maximum fee of $515,000. *Goodrich*, 681 A.2d at 1043. Plaintiff's counsel appealed, arguing that the court erred by not awarding a fee based on the headline amount. *Id.* at 1048. The Delaware Supreme Court observed that when discussing the principles governing fee awards, the Court of Chancery had "acknowledged the merit of the emerging judicial consensus that the percentage of the recovery awarded should decrease as the size of the common fund increases." *Id.* (cleaned up). That was it. The high court did not discuss the concept further. After noting that the Court of Chancery considered multiple factors when exercising its discretion, the Delaware Supreme Court affirmed the award. *Id.* at 1050.

The *Goodrich* decision predated *Americas Mining*, which actually addressed the declining-percentage method and involved a mega-fund case. The defendants argued squarely on appeal that the trial court erred by failing to "correctly apply a declining percentage analysis given the size of the judgment." *Ams. Mining*, 51 A.3d at 1252. The Delaware Supreme Court framed the "question presented" as "how to properly determine a reasonable percentage for a fee award in a megafund case." *Id.* at 1260. The defendants advanced the same interpretation of *Goodrich* as the objectors, and the Delaware Supreme Court rejected it. *Id.* at 1258. The high court made clear that a declining-percentage approach is not required, holding instead that "the multiple factor *Sugarland* approach to determining attorneys' fee awards remained adequate for purposes of applying the equitable common fund doctrine." *Id.*

The *Americas Mining* decision engaged with the argument about reducing the fee in a mega-fund case as part of its analysis of the hourly rate cross-check. *Id.* The *Americas*

28

*Mining* decision makes clear that a trial court can adjust a percentage-based fee downward, but that is "a matter of discretion" and "not required *per se*." *Id.* The Delaware Supreme Court "decline[d] to impose either a cap or the mandatory use of any particular range of percentages for determining attorneys' fees in megafund cases." *Id.* at 1261.

Other than *Goodrich*, the objectors' only other Delaware authorities are transcript rulings. All three predated *Americas Mining.* None supports the objectors' position.

The objectors' best precedent is *Digex*, where the court at least referred to the declining-percentage method in passing and observed that the *Goodrich* case had described that approach as "appropriate and reasonable." *In re Digex, Inc. S'holders Litig.*, at 145–46 (Del. Ch. Apr. 6, 2001) (TRANSCRIPT). The court did not actually apply the declining-percentage method. Instead, the court used a straightforward *Sugarland* analysis.

*Digex* involved an expedited pre-closing injunction application to stop an interested transaction between the company (Digex) and its controlling stockholder (Worldcom). The court denied the injunction application but held that the plaintiffs had shown a reasonable likelihood of success on a claim that the defendants had breached their fiduciary duties by gratuitously waiving Section 203 of the Delaware General Corporation Law on Worldcom's behalf. *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1208 (Del. Ch. 2000). A special committee had negotiated the original transaction and continued to negotiate with all parties. *Digex*, *supra*, tr. at 5. Shortly after the injunction decision, and with the special committee in a lead role, the parties agreed to a settlement that created a common fund consisting of shares of Worldcom stock valued at $165 million. WorldCom agreed to additional relief in the form of $15 million in reimbursement for Digex's fees and expenses

during the litigation, four commercial agreements to support Digex's business, and a commitment to amend Digex's certificate of incorporation to require approvals for interested transactions. *Id.* at 52–53. Plaintiff's counsel valued the total package at $420 million. *Id.* at 52.

Because of the role of the special committee, causation issues loomed large. Two special committee members appeared at the settlement hearing and testified that plaintiff's counsel played only a limited role in generating the settlement. *See id.* at 143. In a later and unrelated case, this court surveyed the shared-credit cases and observed that "[i]n the two most common shared-credit scenarios—those involving topping bidders or special committees—the actor not principally responsible for generating the benefit appears to have been credited with 20% to 25% of the benefit conferred." *Orchard*, 2014 WL 4181912, at *6. Using that range, plaintiff's counsel could claim causal credit for a benefit of $84 million to $105 million.

Plaintiff's counsel sought an all-in award of $24.75 million. *Digex*, *supra*, tr. at 108. Plaintiff's counsel had entered into an engagement letter with two large institutional investors that provided for a maximum fee equal to 15% of the benefit. *Id.* at 80, 82. Rather than seeking 15% of the entire benefit, plaintiff's counsel asked for 15% of the $165 million fund. *Id.* at 103.

The expedited nature of the case meant that plaintiff's counsel had a lodestar of approximately $1.4 million plus expenses of $580,000. *Id.* at 142. The court worked through the *Sugarland* factors and awarded a fee of $12.3 million, reflecting 7.5% of the settlement fund. *Id.* at 147. The court declined to award the full amount requested because

after considering the lodestar crosscheck, the court thought that the award was too generous. *Id.* at 146. The court specifically noted that the 5% suggested by the committee, although consistent with awards in mega-fund cases, would have been "unduly punishing or unfair to the plaintiffs." *Id.* at 149.

The *Digex* decision does not reflect a mega-fund reduction but rather a combination of factors, including (i) shared causation, (ii) an expedited case resulting in a comparatively low lodestar, (iii) a negotiated fee agreement providing for a maximum fee of 15%, and (iv) a traditional *Sugarland* analysis. The *Digex* decision is therefore not a strong case for the declining-percentage method. It also predates *Americas Mining* and its adoption of the stage-of-case method.

Next, the objectors rely on *Crawford*, which they perceive as a *de facto* example of a downward adjustment in a mega-fund case. Not so. The plaintiffs filed suit in *Crawford* just before Christmas. Six weeks later, they obtained a disclosure-based injunction that delayed a merger vote. *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007). Two weeks after that, the Court of Chancery held that the merger triggered appraisal rights and issued an injunction that further delayed the merger vote pending additional disclosure. *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1176 (Del. Ch. 2007). Shortly thereafter, the case settled for an increase in the transaction consideration of $1.60 per share, worth $660 million in the aggregate. Notably, a second bidder had appeared, and the threat of a topping bid played a major role in the price bump. *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, C.A. No. 2635-CC, at 5, 13 (Del. Ch. June 8, 2007) (TRANSCRIPT).

31

Plaintiff's counsel requested and received an all-in fee of $20 million, which the court approved. The objectors claim that because the fee equated to only 3% of the $660 million bump, it must reflect a downward adjustment for a mega-fund. To the contrary, there was a second bidder, so causation issues again loomed large. Using the rule of thumb of 20% to 25% credit, plaintiff's counsel could credibly claim a benefit of approximately $132 million to $165 million, with the $20 million translating to 12% to 15% that range. Those percentages are in line with an early to mid-stage settlement, which is apt for *Crawford*. The expedited injunction phase of the litigation unfolded over ten weeks, and the case progressed little after that point. The court viewed the application as a measured request, and the lodestar cross-check suggested an implied rate of a "couple thousand dollars or more." *Id.* at 15. The *Crawford* decision was a straightforward application of *Sugarland*, not a percentage reduction in a mega-fund case.

Finally, the objectors rely on the fee award in *Southern Peru*, which the Delaware Supreme Court affirmed in *Americas Mining*. That case involved a derivative recovery of $1.9 billion (including pre-judgment interest). *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 819 (Del. Ch. 2011). Even though the case went all the way to a judgment, the plaintiffs sought only 22.5%, not 33%, which still represented a fee request of $428.2 million. The defendants proposed $14 million. Chief Justice Strine, then serving as Chancellor, reduced the percentage from 22.5% to 15%, citing a series of factors. In a passage that the objectors emphasize, he stated:

> Now, I gave a percentage of only 15 percent rather than 20 percent, 22 1/2 percent, or even 33 percent because the amount that's requested is large. I did take that into account. Maybe I am embracing what is a declining thing.

> I've tried to take into account all the factors, the delay, what was at stake, and what was reasonable. And I gave defendants credit for their arguments by going down to 15 percent. The only basis for some further reduction is, again, envy or there's just some level of too much, there's some natural existing limit on what lawyers as a class should get when they do a deal.

*Ams. Mining*, 51 A.3d at 1259 (quoting trial court ruling). The objectors regard this as an endorsement of the declining-percentage approach, but it actually reflects the Chancellor's consideration of all of the *Sugarland* factors, including the plaintiff's delay in prosecuting the case. Elsewhere in the transcript, the Chancellor criticized the concept of a reduction in mega-fund cases. *See In re S. Peru S'holder Litig.*, No. 961-CS, at 77, 83 (Del. Ch. Dec. 19, 2011) (TRANSCRIPT). As part of his remarks, he noted that other contingently compensated professionals, such as investment bankers and fund managers, do not have their fees reduced as the value that they generate increases, and he queried why lawyers should be treated differently. *Id.* at 81–82, 97–99, 102–04. While serving on this court, Chief Justice Strine had made similar comments in other transcript rulings approving fee awards.[14]

---

[14] *See In re Clear Channel Outdoor Hldgs., Inc., Deriv. Litig.*, 2013 WL 5563370, at *19 (Del Ch. Sept. 9, 2013) (TRANSCRIPT) ("We've always adhered to the idea that if you get a very solid recovery, you should have a very solid fee. That's the way the best incentive system works. You don't want to say, 'If you get really good results, we're going to shave your fee.' That doesn't make any sense. We should be shaving a fee when there are not really good results."); *Forgo v. Health Grades, Inc.*, 2011 WL 9535201, at 65 (Del. Ch. June 29, 2011) (TRANSCRIPT) ("[T]he declining percentage doesn't interest me because I do think you want people—if people swing for the fences and they hit the home run, they deserve the home run fee."); *In re Am. Int'l Gp., Inc. Cons. Deriv. Litig.*, C.A. No. 769-VCS, at 9–10 (Del. Ch. Jan. 25, 2011) ("I've said this before and I will continue to say it—that, you know, you don't reduce people's fees because they gain much. You should, in fact, want to create an incentive for real litigation.").

As these precedents show, *Americas Mining* and its progeny neither call for nor commend a practice of reducing the percentage of the benefit awarded as a fee in a mega-fund case. The *Americas Mining* framework uses a stage-of-case method that rewards plaintiff's counsel for the greater risk associated with pushing deeper into the case. "The incentive effects of the sliding [fee] scale apply equally to large and small settlements." *Activision*, 124 A.3d at 171. Under *Americas Mining* and *Sugarland*, a court does not make a downward adjustment to the indicative percentage based on the size of the fund.

## ii.   Federal Securities Cases

The objectors and professors are on stronger ground when they look to fee awards in federal securities actions. They have shown that when awarding fees for settlements of $1 billion or more, federal courts award approximately 10% of the common fund. They have also shown that some federal courts expressly adjust the percentage downward if it generates an implied hourly rate that strikes the judge as too high. But while the objectors and professors have shown that the federal courts use that framework for securities actions, they have not shown that the same framework should apply in a Chancery M&A case where a plaintiff seeks post-closing monetary relief. The two types of litigation are superficially similar, but there are significant differences.

As noted, the objectors and the professors have demonstrated that federal courts use a declining-percentage method for securities class actions. A 2022 report by Nera Consulting that studied federal securities cases from 2012 to 2021 found that the median percentage award gradually declines from 33.5% to 25.8% as the common fund increases from $5 million or less to $500 million. The median percentage then drops to 17.7% for

34

common funds between $500 million and $1 billion. Finally, the median percentage drops to 10.5% for common funds exceeding $1 billion. Obj., Ex. B at 27. The ten largest federal securities settlements of all time—all common funds of $1 billion or more—generated an average award of 9.4%. *Id.* at Ex. C. Likewise, an academic study published in 2010 found that "fee percentage is strongly and inversely associated with settlement size . . .; [when] a settlement size of $100 million was reached . . . fee percentages plunged well below 20 percent." Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 814 (2010). For settlements between $500 million and $1 billion, the median was 12.9%, and for settlements over $1 billion, the median was 9.5%. *Id.* at 839, tbl. 11.

Two of the professors are co-authors of a forthcoming article that drills deeper into these issues. *See* Stephen Choi, Jessica M. Erickson & A.C. Pritchard, *The Business of Securities Class Action Lawyering*, 99 Ind. L. J. (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4350971 [hereinafter *Securities Lawyering*]. The authors collected data on every federal class action involving a securities disclosure claim against a public company from 2005 and 2018, for a total of 2,492 class actions. From the dockets, they hand-collected more than 200 variables for each case. By any measure, it is an impressive effort. Organizing the cases by deciles, they find that percentage fee awards range between 26% and 28% until the seventh decile, when they decline moderately, then decline further in the tenth decile to 19.6%.



The professors also seek to counter the argument that the declining-percentage method creates disincentives for plaintiff's counsel to litigate large cases. Using their decile-based system, they calculate the fee award as a multiple of lodestar. They find that although the award as a percentage of the common fund declines as the fund increases, the lower percentages generate higher multiples to lodestar. Larger cases are thus more profitable, even with lower percentage-based awards. The professors conclude that the declining-percentage method does not create a disincentive for lawyers to litigate larger securities cases.



**Mean Multiplier, by Settlement Decile**

The authors of the *Securities Lawyering* article also find that the likelihood of non-recovery for a plaintiff's firm falls dramatically after a securities case survives a motion to dismiss. *Id.* at 60. The authors suggest that the hours that a plaintiff's firm incurs after surviving a motion to dismiss carry a smaller risk of non-recovery and should be worth less when a court awards fees. The article concludes that, relative to risk, plaintiffs' counsel are undercompensated before a motion to dismiss, but overcompensated afterward. Relatedly, the authors find that top-earning plaintiff's firms tend to win lead counsel fights in cases with stronger indicia of wrongdoing. They note that because of those stronger indicia, those cases are more likely to achieve settlements. The professors conclude that for the cases that top-tier lawyers file, the hours are less risky still, suggesting that those firms are overcompensated.

Finally, the professors observe that in federal securities actions, larger issuers will have larger damages (all else equal). *Id.* at 62. Earlier scholars made the same point: "Damages reflect the market losses when the fraud is uncovered. A larger company will have correspondingly larger market losses, regardless of the skills or performance of the law firms in the resulting litigation." Eisenberg & Miller, *supra*, at 64. If a principal driver of the larger recoveries is the larger capitalizations associated with big issuers, then awarding the same percentage of a larger recovery simply rewards plaintiffs' counsel for suing a larger firm.

These all seem to be valid points for federal securities actions, but that does not mean that the declining-percentage method is optimal for judges to use, even in federal securities cases. Professor Brian Fitzpatrick has authored a helpful overview of different approaches for setting fees. *See* Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees In Class Actions*, 89 Fordham L. Rev. 1141 (2021) [hereinafter *Judge's Guide*]. He argues that judges should attempt to replicate the terms on which a sophisticated client would retain counsel, and he evaluates how sophisticated clients structure contingent fees in the real world. He finds that sophisticated clients consistently opt for a percentage-of-the-benefit model, "either with fixed percentages or escalating percentages as litigation matures." *Id.* at 1160. Professor Fitzpatrick believes that judges likewise should use that method. *Id.* at 1163; *accord id.* at 1153–54. That is what the *Americas Mining* stage-of-case method does.

Professor Fitzpatrick has little good to say about the declining-percentage method. He notes that this approach "is unheard of in the marketplace." *Id.* at 1167. Thus, "[i]f

judges want to do what rational absent class members would want to do, then they should not do this." *Id.* He also offers reasons why clients would not want to bargain for a decreasing percentage, notwithstanding the possibility of economies of scale. The reasons include (i) the transaction costs associated with negotiating away from a one-third, fixed-percentage arrangement, (ii) strategic uncertainties if parties have asymmetric information about the merits of the case, and (iii) the need for increased monitoring for premature settlements. *Id.* at 1163. Increased monitoring is necessary because the declining-percentage method fails to provide counsel with a predictable incentive to press forward with the case. Instead, a client (or the court) must assess the legitimacy of the hours that the attorneys have invested to test for overcompensation. *Id.* at 1167. He concludes with the observation that while incorporating the benefits of economies of scale might be desirable, "bringing marginal price down to marginal cost is not free." *Id.* at 1168.

Professor Fitzpatrick makes a strong argument against using the declining-percentage method in federal securities cases, notwithstanding the data that the professors have presented. But assuming the declining-percentage method is a reasonable approach for federal securities litigation, it still may not be a reasonable approach for Chancery M&A litigation.

For starters, the federal courts seem to be using the declining-percentage method as a backdoor—and backward looking—lodestar method. Under the traditional lodestar method, a court begins with counsel's lodestar and applies a risk multiplier to increase the fee to account for risk. Under the declining-benefit method, the court starts with a percentage of benefit conferred, then decreases the fee until the risk multiplier seems

39

appropriate for the risk. In *Sugarland*, the Delaware Supreme Court rejected the lodestar approach. 420 A.2d at 150. This court should not be deploying the declining-percentage methodology to undermine that decision.

Next, it is far from clear that the attributes of Chancery M&A litigation in the post-*Trulia* era are sufficiently similar to federal securities actions to warrant similar treatment. What we lack—and what would be wonderful to have—is a thorough study akin to the analysis conducted in *Securities Lawyering*. For now, I must operate based on my own experience as a judge and practitioner, plus learning from a handful of articles that have looked at aspects of Chancery M&A litigation during the pre-*Trulia* period.[15]

---

[15] *See* Matthew B. Cain & Steven Davidoff Solomon, *A Great Game: The Dynamics of State Competition and Litigation*, 100 Iowa L. Rev. 465 (2015); John Armour, Bernard Black & Brian Cheffins, *Delaware's Balancing Act*, 87 Ind. L. J. 1345 (2012); John Armour, Bernard Black & Brian Cheffins, *Is Delaware Losing Its Cases?*, 9 Empirical Legal Stud. 605 (2012); Bernard Black, Brian Cheffins & John Armour, *Delaware Corporate Litigation and the Fragmentation of the Plaintiff's Bar*, 2012 Colum. Bus. L. Rev. 427; Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions*, 57 Vand. L. Rev. 1797 (2004); Randall S. Thomas & Robert B. Thompson, *The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions*, 57 Vand. L. Rev. 133 (2004).

Only two articles have examined Chancery M&A litigation post-*Trulia*. One examined suits in 2017, the first post-*Trulia* year, so its value is limited. Matthew B. Cain et al., *The Shifting Tides of Merger Litigation*, 71 Vand. L. Rev. 603 (2018) [hereinafter *Shifting Tides*]. The other charted a diaspora in which the lawyers responsible for filing the lowest quality lawsuits fled from Delaware to the federal courts. Sean J. Griffith, *Frequent Filer Shareholder Suits in the Wake of* Trulia*: An Empirical Study*, 2020 Wis. L. Rev. 443 (2020) [hereinafter *Frequent Filer*]. Those lawsuits do not generate monetary recoveries and so are not pertinent. I have nevertheless drawn on those articles to the extent possible.

At the outset, candor demands conceding the existence of a number of surface-level similarities between federal securities cases and Chancery M&A litigation.

- Both seek to supply private enforcement of legal norms but are vulnerable to abuse.

- Similar types of plaintiffs appear in both types of actions.

- Both types of litigation are largely lawyer driven, and some of the same firms appear in both types of cases.

- Both types of litigation involve contingent compensation arrangements that give rise to similar conflicts of interest and agency costs.

But there are significant differences. One is the sheer volume of federal securities litigation and the magnitude of the recoveries. During the period from 2017 to 2021, there were 850 core federal securities lawsuits that asserted claims under Rule 10b-5. *See* Cornerstone Research, *Securities Class Action Filings: 2021 Year In Review* 4 (2022). Over the same period, there were 397 settlements that generated common funds totaling $15.4 billion. Cornerstone Research, *Securities Class Action Settlements: 2021 Review and Analysis* 3 (2022). Nearly half (46.7%) of the cases resulted in favorable settlements.

Across the same period (2017 to 2021), there were 913 lawsuits filed in the Delaware Court of Chancery asserting claims for breach of fiduciary duty.[16] More finely grained data is not available, so this figure includes not only M&A litigation but also all other types of fiduciary duty litigation, such as derivative actions. While the topline figure is roughly similar to the number of federal securities filings, the other datapoints are vastly

---

[16] The per-year figures are 142 in 2017, 165 in 2018, 196 in 2019, 194 in 2020, and 216 in 2021.

lower. The plaintiff has identified just ten settlements generating common funds in cases subject to entire fairness review, and those cases yielded aggregate settlement proceeds of $449.47 million.[17] They identified another nine settlements generating common funds in cases governed by enhanced scrutiny, and those cases yielded aggregate settlement proceeds of $226 million.[18] Between 2017 and 2021, Chancery M&A litigation thus generated a total of nineteen common fund settlements (versus 397 in federal securities actions) and a total of $675.47 million in proceeds (versus $15.4 billion from federal

---

[17] *See* Dkt. 514 Ex. 7 at 1–7. For the period from 2012 to 2022, the plaintiff identified a total of twenty-three settlements in entire fairness cases. The ten settlements reached in the years from 2017 to 2021 were *Cornerstone* (2017), *Starz* (2018), *Good Technology* (2018), *Calamos* (2019), *Handy & Harmon* (2019), *Schuff* (2020), *Weinstein* (2020), *Malone* (2021), *Amtrust* (2021), and *Alon USA* (2021). There were six settlements reached in 2022: *TD Bank*, *Pivotal*, *Straight Path*, *AVX*, *Akcea*, and *HomeFed*. Those six settlements generated aggregate proceeds of $164 million. There were another seven settlements during the period from 2012 to 2016: *Delphi* (2012), *CNX Gas* (2013), *Orchard* (2014), *Jefferies* (2015), *GFI Group* (2016), *Venoco* (2016), and *C&D Tech* (2016). Those seven settlements generated aggregate proceeds of $199 million. There was also a post-trial settlement in *Dole* in 2016, which the plaintiffs did not identify, that generated a common fund of $115.7 million. The plaintiff identified one settlement from 2023, but to avoid an open-ended inquiry, the court cut off the sample at year-end 2022.

[18] *See* Dkt. 514 Ex. 7 at 8–14. For the period from 2012 to 2022, the plaintiff identified a total of nineteen settlements in enhanced scrutiny cases. The nine settlements reached in the years from 2017 to 2021 were *ExamWorks* (2017), *Dreamworks* (2018), *Saba Software* (2018), *Appel* (2020), *KCG Holdings* (2020), *Tangoe* (2020), *Towers Watson* (2021), *Searles* (2021), and *Weiss* (2021). There were three settlements reached in 2022: *Columbia Pipeline*, *CVR*, and *Mindbody*. Those three settlements generated aggregate proceeds of $184.5 million. There were another seven settlements during the period from 2012 to 2016: *El Paso* (2012), *Gardner Denver* (2014), *Arthrocare* (2014), *Globe Specialty Materials* (2016), *PLX* (2016), *Tibco* (2016), and *Chen v. Howard-Anderson* (2016). Those settlements generated aggregate proceeds of $262.6 million. There was also the damages recovery of $70 million in *Rural Metro* in 2014.

securities actions). In federal securities actions, settlements were reached in approximately 46.7% of the new filings over the same period. Assuming conservatively that M&A litigation represented one-third of the breach of fiduciary duty cases filed over the same period, settlements were reached in less than 10% of new filings during that period. These figures suggest that per case filed, plaintiff's lawyers in Chancery M&A litigation face far higher rates of dismissal, far lower prospects of settlement, and far smaller potential recoveries.

Another difference is the ability of plaintiff's counsel to identify high quality cases. As the *Securities Litigation* article notes, high quality securities cases often follow the filing of criminal charges, the firing of a top officer, or a financial restatement. *See Securities Litigation*, *supra*, at 13–14. Although half of all securities actions are dismissed at the pleading stage, that statistic plummets for cases where there are strong initial indicia of wrongdoing. Only 9.1% of cases are dismissed where there is a parallel SEC investigation, only 13.9% where there is another government investigation, only 25.9% where there is an officer termination, and only 9.6% where there is a restatement. *Id.* at 29. Although derivative actions in the Court of Chancery often follow a corporate trauma, suggesting similar dynamics may be in play, there is no similar set of signals for Chancery M&A litigation. True, some types of M&A cases—such as transactions involving controlling stockholders—involve conflicts of interest and make a complaint more likely to survive a motion to dismiss, but rarely are deals singled out by federal or state prosecutors, flagged by agency investigations, or marked by similar red flags. To the contrary, the defendants in Chancery M&A litigation are well-represented by sophisticated

law firms who are trying to craft a record that causes the litigation to fail at the outset. *See generally* Leo E. Strine, Jr., *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 Bus. Law. 679 (2015). For Chancery M&A litigation, plaintiff's lawyers must read between the lines of the background section of a proxy statement, then conduct their own investigations using Section 220 of the Delaware General Corporation Law or other tools at hand. I suspect there is no class of cases where dismissal rates drop to the levels seen for high-quality securities class actions.

Along similar lines, the mega-settlements achieved in federal securities actions have often benefited from criminal or regulatory investigations. The massive securities settlements that the objectors and the professors have cited include some of the greatest hits of corporate malfeasance: Enron (2012), Cendant (2000), Petrobras (2018), Bank of America (2013), Nortel (2006), Valeant (2021), Worldcom (2005), Tyco (2007), AOL Time Warner (2006), Household (2016), and Royal Ahold (2006). Prosecutors criminally charged senior executives from Enron, WorldCom, Cendant, Tyco, Petrobras, Nortel, Royal Ahold, and Valeant. They charged mid-level executives from AOL Time Warner. State investigators sued Household and settled for $484 million. The Bank of America issues were the subject of intense investigations into the events leading to the 2008 financial crisis. As the authors of *Securities Litigation* acknowledge, "The billion-dollar settlements in cases against companies like Enron or Petrobas may function as a lottery ticket of sorts." *Securities Litigation*, *supra*, at 36. There is no similar lottery effect in Chancery M&A litigation. Plaintiff's counsel can only secure a large settlement by

conducting a detailed investigation before filing suit, surviving a motion to dismiss, building a strong case through discovery, then being prepared to litigate through trial.

A third difference is the relative risk that plaintiff's counsel undertakes after a case survives a motion to dismiss. Securities class actions almost never go to trial, and many settle prior to discovery. *Id.* at 8 n.37, 54. Chancery M&A litigation is different, even for transactions governed by the entire farness test. "While the reverberations of isolated plaintiffs' victories continue to echo in the collective consciousness, scholarly research establishes that only exceptional entire fairness cases result in meaningful damages awards."[19] Since *Americas Mining*, there have been at least ten post-trial decisions in entire fairness cases where the defendants prevailed,[20] plus three more where the court awarded

---

[19] *Basho*, 2018 WL 3326693, at *35. *See, e.g.*, Reza Dibadj, *Networks of Fairness Review in Corporate Law*, 45 San Diego L. Rev. 1, 22 (2008) (noting that "[w]hile the conventional wisdom might suggest that standards of review are typically outcome determinative, the empirical research suggests the fairness standard is not" and cataloging cases where defendants prevailed (footnote omitted)); Julian Velasco, *A Defense of the Corporate Law Duty of Care*, 40 J. Corp. L. 647, 689 (2015) (collecting cases where defendants prevailed under entire fairness and noting that "[o]nce applied, the entire fairness test is no longer considered outcome-determinative").

[20] *See In re Oracle Corp. Deriv. Litig.*, 2023 WL 3408772 (Del. Ch. May 12, 2023); *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641 (Del. Ch. Aug. 19, 2022); *Coster v. UIP Cos., Inc.*, 2022 WL 1299127 (Del. Ch. May 2, 2022), *aff'd*, 255 A.3d 953 (Del. 2023); *In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185 (Del. Ch. Jan. 18, 2022), *aff'd*, --- A.3d ----, 2023 WL 3854008 (Del. June 6, 2023); *Dieckman v. Regency GP LP*, 2021 WL 537325 (Del. Ch. Feb. 15, 2021); *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476 (Del. Ch. May 4, 2020); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *1 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013); *Zimmerman v. Crothall*, 62 A.3d 676 (Del. Ch. 2013).

only nominal damages of $1.00.[21] Not only that, but plaintiffs who have prevailed at trial continue to face significant risk on appeal. As noted previously, since *Americas Mining*, the Delaware Supreme Court has heard appeals from six post-trial damages awards in which representative plaintiffs obtained cash recoveries and the defendants challenged the liability determination. The high court affirmed the first two and reversed the next four. In federal securities litigation, prevailing on a motion to dismiss makes settlement highly likely. Cases are not tried, so there is no risk of a post-trial loss or a reversal of a victory

---

Defendants enjoyed success under the entire fairness standard before *Americas Mining* as well. For earlier Delaware Supreme Court decisions affirming post-trial judgments finding that transactions were entirely fair, see *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79 (Del. 1995); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995); *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del. 1985). For earlier Delaware Court of Chancery decisions finding that transactions were entirely fair, see *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, 2011 WL 863007 (Del. Ch. Mar. 9, 2011), *aff'd*, 35 A.3d 419 (Del. 2011); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634 (Del. Ch. Jan. 14, 2011); *Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399 (Del. Ch. Sept. 24, 2010); *Kates v. Beard Rsch., Inc.*, 2010 WL 1644176 (Del. Ch. Apr. 23, 2010); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003); *Emerald P'rs v. Berlin*, 2003 WL 21003437 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003); *Liberis v. Europa Cruises Corp.*, 1996 WL 73567 (Del. Ch. Feb. 8, 1996), *aff'd*, 702 A.2d 926 (Del. 1997); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303 (Del. Ch. Mar. 7, 1991); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990); *Rabkin v. Olin Corp.*, 1990 WL 47648 (Del. Ch. Apr. 17, 1990), *aff'd*, 586 A.2d 1202 (Del. 1990) (TABLE); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989); *see also Kleinhandler v. Borgia*, 1989 WL 76299 (Del. Ch. July 7, 1989) (summary judgment).

[21] *See Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860 (Del. Ch. Mar. 21, 2018), *aff'd*, 210 A.3d 705 (Del. 2019); *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261 (Del. Ch. Sept. 4, 2014); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014). For an earlier decision awarding only nominal damages, see *Oliver v. Bos. Univ.*, 2006 WL 1064169 (Del. Ch. Apr. 14, 2006).

on appeal. In Chancery M&A litigation, the calculus is quite different. Cases are tried. The risk of a post-trial loss is real, and the risk of reversal is high.

That said, this case provides some indicative support for one consideration that the professors rely on to support the declining-percentage method in federal securities cases. The data from the precedent settlements indicates that just as securities law settlements vary based on market capitalization, Chancery M&A settlements vary based on deal size. While I have neither an extensive dataset nor the professors' technical expertise, I have run some simple regressions using the settlement data that plaintiff's counsel provided.

The first group consists of twenty-four settlements in deal cases since *Americas Mining* where entire fairness presumably applied. *See* Dkt. 514 Ex. 7. Eight involved transactions valued at less than $100 million (*Handy & Harmon*; *Cornerstone*; *C&D Technology*; *Salladay*; *Good Technologies*; *Schuff*; *Orchard*; and *Weinstein*). Scholars often exclude deals under $100 million from datasets because they have unique attributes.[22] This decision does the same.

---

[22] *See, e.g.*, Matthew D. Cain, Antonio J. Macias & Steven Davidoff Solomon, *Broken Promises: The Role of Reputation in Private Equity Contracting and Strategic Default*, 40 J. Corp. L. 565, 579–580 (2015); Brian JM Quinn, *Optionality in Merger Agreements*, 35 Del. J. Corp. L. 789, 809 (2010); Steven M. Davidoff, *The Failure of Private Equity*, 82 S. Cal. L. Rev. 481, 483–84 n.11 (2009).

That leaves a total of seventeen datapoints: sixteen precedents plus the settlement in this case.

| | Transaction | Transaction Value (Millions) | Settlement Value (Millions) |
|---|---|---|---|
| 1 | Calamos | $130.00 | $30.00 |
| 2 | Homefed | $156.30 | $15.00 |
| 3 | Venoco | $363.00 | $19.00 |
| 4 | GFI Group | $366.00 | $10.75 |
| 5 | Alon USA Energy | $407.00 | $44.75 |
| 6 | Akcea | $446.50 | $12.50 |
| 7 | CNX Gas | $605.88 | $42.70 |
| 8 | AVX | $1,030.00 | $49.90 |
| 9 | Amtrust | $1,040.00 | $40.00 |
| 10 | Pivotal | $1,430.00 | $42.50 |
| 11 | Jefferies | $2,400.00 | $70.00 |
| 12 | Straight Path | $2,450.00 | $12.50 |
| 13 | Delphi | $2,500.00 | $49.00 |
| 14 | Starz | $4,400.00 | $92.50 |
| 15 | Malone | $7,400.00 | $110.00 |
| *16* | *Dell Class V* | *$23,900.00* | *$1,000.00* |
| 17 | TD Bank | $26,000.00 | $31.50 |

A linear regression using this data generates a best-fit line with an R-squared of 0.4109, a P value of 0.0056, and an F value of 10.46, indicating that approximately 41% of the variation in the size of the settlement is explained by the size of the transaction using the formula Y= 0.01885*X + 15.22. The following plot illustrates that result:



The second group consists of twenty settlements in deal cases since *Americas Mining* where enhanced scrutiny presumably applied. *See* Dkt. 514 Ex. 7. None of the transactions had deal values under $100 million, so none need to be excluded.

| | Case | Transaction Value (Millions) | Settlement Value (Millions) |
|---|---|---|---|
| 1 | Chen | $130.10 | $35.00 |
| 2 | CVR | $240.50 | $78.50 |
| 3 | Tangoe | $256.00 | $13.00 |
| 4 | PLX | $260.00 | $14.10 |
| 5 | Weiss | $302.00 | $17.50 |
| 6 | Saba Software | $400.00 | $19.50 |
| 7 | KCG | $932.00 | $22.00 |
| 8 | Globe Specialty | $937.00 | $32.50 |
| 9 | Arthrocare | $1,360.00 | $12.00 |
| 10 | ExamWorks | $1,400.00 | $86.50 |
| 11 | MindBody | $1,700.00 | $27.00 |
| 12 | Appel v. Berkman | $2,100.00 | $25.50 |
| 13 | Searles v. DeMartini | $2,160.00 | $23.00 |
| 14 | Dreamworks | $3,120.00 | $4.50 |

| 15 | Gardner Denver | $3,900.00 | $29.00 |
| 16 | Tibco | $3,900.00 | $30.00 |
| 17 | Towers Watson | $9,192.00 | $15.00 |
| 18 | Columbia Pipeline | $10,200.00 | $79.00 |
| 19 | El Paso | $20,770.00 | $110.00 |

A linear regression using this data generates a best-fit line with an R-squared of 0.3477, a P value of 0.0079, and an F value of 9.063, indicating that approximately 35% of the variation in the size of the settlement is explained by the size of the transaction using the formula Y= 0.003446*X + 23.98. The following plot illustrates that result:



Although both datasets show a statistically significant relationship between transaction size and settlement size, the sample sizes are small. The relationship could be a Type-I error (false positive), or the explanatory power could be low. I am particularly leery of the latter risk. The settlements in *TD Bank* and this case are significant outliers in

the dataset for entire fairness cases, which is the more relevant dataset for this case.[23]

Without those two datapoints, a basic linear regression using the other fifteen datapoints generates a best-fit line with an R-squared of 0.704, a P value of less than 0.0001, and an F value of 30.92, indicating that approximately 70% of the variation in the size of the settlement is explained by the size of the transaction using the formula $Y = 0.01246 * X + 21.87$. Adding the settlements in *TD Bank* reduces the explanatory power of transaction size to approximately 41%. Not only that but the equation without those two datapoints predicts that a settlement in a case challenging a $23.9 billion deal should be around $320 million, yet this case the settlement is over three times that amount, and the settlement in *TD Bank* (a challenge to a $26 billion deal) was under one-tenth that amount.

The indications from the two datasets are not sufficiently persuasive to support a departure from *Americas Mining.* The other reasons that plausibly justify using the declining-percentage method in federal securities actions do not carry over to Chancery M&A litigation. If future research points to greater crossover or otherwise supports a different method, then I personally would be open to considering it. At present, that

---

[23] Or so I thought. The separate datasets for enhanced scrutiny and entire fairness cases reflect a prior expectation that the standard of review would affect the distribution of outcomes. Interestingly, using the combined dataset and regressing a dummy variable for whether the transaction was subject to entire fairness review did *not* generate a statistically significant result. When the datasets are combined, the relationship between deal size and settlement size remains significant. A linear regression using the combined dataset generates a best-fit line with an R-squared of 0.3287, a P value of 0.0003, and an F value of 16.65, indicating that approximately 33% of the variation in the size of the settlement is explained by the size of the transaction using the formula $Y = 0.01430 * X + 10.21$.

showing has not been made. One of the professors said it best in a tweet about the *Securities Litigation* study: "Delaware cases are different and not part of our study."[24] I agree.

Turning from the general to the specific, none of the reasons for a mega-fund reduction apply to this case. The risk of a non-recovery in this case (at trial or on appeal) was significant, and the risk intensified as trial approached. The recovery of $1 billion does not seem to have been the product of deal size. It is rather a landmark settlement that dwarfs the aggregate recoveries in all other settlements in entire fairness cases since *Americas Mining*, which total $642 million. The $1 billion recovery in this case is approximately equal to the aggregate recoveries in all of the Chancery M&A settlements since *Americas Mining*, which generated total recoveries of $1.055 billion. Reducing the requested award is not necessary from a compensatory perspective, because the implied rate of approximately $5,000 per hour is lower than rates this court has approved for smaller recoveries. *See* Brief for Plaintiff at 64, *Activision*, 124 A.3d 1025 (2015) (C.A. No. 8885-VCL) (collecting fee awards with higher implied hourly rates). The multiple to lodestar of 7x in this case would not raise a federal eyebrow.[25]

---

[24] @ProfJErickson, X f/k/a Twitter (Mar. 2, 2023, 6:24 PM), https://twitter.com/ProfJErickson/status/1631435295840149504.

[25] *See, e.g.*, *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (10.15x multiplier); *Kane Cnty., Utah v. United States*, 145 Fed. Cl. 15, 19–20 (Fed. Cl. 2019) (6.13x multiplier; collecting cases approving or referencing multipliers between 5.39x to 19.6x); *In re Doral Fin. Corp. Sec. Litig.*, No. 05-MDL-1706 (S.D.N.Y. July 17, 2007) (Dkt. 107) (10.26x multiplier); *New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3x multiplier); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *18 (E.D.

The rationales for using the declining-percentage method in federal securities litigation have not been shown to apply to Chancery M&A litigation. In particular, they do not apply to this case. The court will not make a downward adjustment based on the size of the common fund.

### c. Evidence From Arm's-Length Agreements

A separate source of evidence for determining an appropriate percentage of the results obtained comes from privately negotiated contingency fee agreements. The objectors and the professors encouraged the court to look to these sources. Other scholars commend that practice.[26] A series of federal decisions have approved using private fee

---

Pa. May 19, 2005) (15.6x multiplier); *In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327, 337–38 (Bankr. D. Md. 2000) (19.6x multiplier); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (D. Mass. 1998) (8.9x multiplier).

[26] *See* Choi, *supra*, at 12–13 ("Sophisticated institutional investors, however, may negotiate an ex ante fee agreement when selecting lead counsel. Although a court is not bound by these agreements, courts often take them into account." (internal footnotes omitted)); Lynn A. Baker, Michael A. Perino & Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 Colum. L. Rev. 1371, 1433–34 (2015) (advocating for a system of "[e]x ante review of fee agreements [to] enable[ ] judges to distinguish lead plaintiffs who are doing their jobs from those who are not, before litigation proceeds very far"); Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Tex. L. Rev. 865, 869 (1992) (advocating the replacement of "the lodestar method in all fee-shifting cases, regardless of the kind of relief sought," with an award system "base[d] . . . on fee agreements plaintiffs enter into with their lawyers"); Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 Cornell L. Rev. 656, 700–01, 702–03 (1991) ("Unjust enrichment occurs in class actions because absent plaintiffs enjoy the fruits of an attorney's labor without purchasing the right to do so. The remedy should therefore require absent plaintiffs to pay an amount which, if offered in advance, an attorney would willingly accept. The best guess at that amount is an attorney's usual and customary rate. . . . In cases waged by contingent fee practitioners, it is inappropriate to focus on effective hourly rates *ex post*; . . . What is important . . . is to

agreements as a basis for determining an appropriate fee award in a common fund case.[27]

And this court has considered an attorneys' fee arrangement with its stockholder client when determining a reasonable fee.[28]

---

pay attorneys on terms they would probably accept in an *ex ante* bargain . . . ."); Coffee, *supra*, at 669 ("'[L]aw should mimic the market.'. . . [which] mean[s] attempting to award the fee that informed private bargaining . . . might have reached.").

[27] *See In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 744 (7th Cir. 2011) (holding that lead counsel in a class action should receive a fee award consistent with the "the contingent fee that the class would have negotiated with the class counsel at the outset had negotiations with clients having a real stake been feasible"); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282–84 (3d Cir. 2001) (holding that for purposes of fee awards under the PLSRA, "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel"); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006) ("[T]he more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases."); *Nilsen v. York Cnty.*, 400 F. Supp. 2d 266, 277–78 (D. Maine 2005) (examining various methods for measuring the reasonableness of a common fund attorneys' fee and concluding that "the methodology of the Seventh Circuit" is the most attractive).

[28] *See Wis. Inv. Bd. v. Bartlett*, 2002 WL 568417, at *6 (Del. Ch. Apr. 9, 2002) ("[A]lthough not specifically listed as [a] factor in our [*Sugarland*] analysis, the terms of a fee arrangement between the law firm and its client are appropriate for the Court to consider. Fee agreements cannot absolve the Court of its duty to determine a reasonable fee; on the other hand, an arm's-length agreement, particularly with a sophisticated client, as in this instance, can provide an initial 'rough cut' of a commercially reasonable fee."), *aff'd*, 808 A.2d 1205 (Del. 2002); *see also Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012) (noting that when determining a reasonable fee for indemnification or advancement, an arm's-length agreement can provide a starting point for a reasonable fee).

In Professor Fitzpatrick's 2021 study, he found that sophisticated clients choose to pay fixed one-third percentages or even higher escalating percentages based on litigation maturity. *Judge's Guide*, *supra*, at 1170. In patent cases, he found that fee agreements provided for either (i) a fixed percentage, with a mean of 38.6%, or (ii) a percentage that escalated as the litigation matured, with a mean percentage of 28% upon filing and up to 40.2% through appeal. *Id.* at 1161. Not only that, but more clients chose the latter (the *Americas Mining* style stage-of-case method) than the former. "No one escalated or deescalated based on recovery size." *Id.*

Professor Fitzpatrick also looked at large antitrust cases in the pharmaceutical industry where classes of large corporations sue other large corporations, such as a class of drug wholesalers suing drug manufacturers. The potential damages were enormous. He found that the fee requests ranged from a fixed percentage of 27.5% to a fixed percentage of one-third, that the one-third figure "*heavily* dominated," and that the average was 32.85%. *Id.* He concluded that "corporations in these cases appear perfectly happy with the percentage method and perfectly happy with the same fixed percentage of one-third that most unsophisticated clients also choose." *Id.* at 1162. Those percentages were all-in percentages, inclusive of expenses. None of the clients sought decreasing fee percentages based on economies of scale. *Id.* at 1163.

A 2012 study reached similar conclusions. *See* David L. Schwartz, *The Rise of Contingent Fee Representation In Patent Litigation*, 64 Ala. L. Rev. 335 (2012). That study examined forty-two contingency fee agreements in patent cases, where large companies sued one another, and found that ten used a fixed flat rate, thirty-two used an increasing

rate, and none used a diminishing percentage. *See id.* at 360 & nn.136–37. The mean percentage was 38.6% of the recovery. *Id.* at 360. When clients deviated from a fixed percentage, the fee percentage increased as the case progressed, as under the *Americas Mining* framework, but with higher percentages. Those agreements started at an average percentage of 28% upon filing and ended with an average of 40.2% for taking the case through appeal. *Id.*

Two anecdotal examples comport with those studies. In a recent Chancery M&A case, the fee agreement with a major law firm provided for a fixed, one-third contingency fee which the court described as "quite typical and commercially reasonable." *S'holder Representative Servs. LLC v. Shire US Hldgs., Inc.*, 2021 WL 1627166, at *2 (Del. Ch. Apr. 27, 2021). In another Chancery M&A case, the court noted that the plaintiff hired a white-shoe firm under a contingency agreement that contemplated reimbursement of out-of-pocket expenses plus "40% of any excess recovery as attorneys' fees." *In re Nine Sys. Corp. S'holders Litig.*, 2015 WL 2265669, at *1 (Del. Ch. May 7, 2015). The court enforced the agreement.

The professors suggested that the court ask plaintiff's counsel in this case to produce their past contingent fee agreements for *in camera* review. The court did, and it made the same request of the objectors. Plaintiff's counsel expended significant efforts to provide the information that the court requested. Except for Pentwater, none of the objectors did. Pentwater provided one agreement, and it was not for a Delaware case.

The fee agreements submitted by plaintiff's counsel fully support the base award.

- One firm collected and analyzed 107 responsive *ex ante* fee agreements, constituting approximately one-third of the firm's contingent fee engagements. Approximately 80% were flat percentage arrangements, with the mean and median percentages above the base percentage. That held true in cases with an expected recovery in excess of $100 million. Approximately 15% provided increasing percentages as the amounts recovered increased. Only 5% provided for a decreasing percentage, and only one involved a case with an expected recovery greater than $100 million. Under that agreement, the percentage of the recovery started materially higher than the base percentage such that even after the full decrease, the percentage recovery still exceeded the base percentage.

- A second firm collected and reviewed 339 *ex ante* fee agreements, constituting all of the firm's contingent fee engagements during the past five years. Approximately 69% of that firm's agreements simply permitted the firm to apply for a court-approved fee. Some iterations of the agreement provided for a cap on the application at 33% of the recovery. In a subset of agreements limited to a particular agreement, the cap was set at 25% of the recovery. Less than 1% of the firm's agreements provided for an increasing percentage as the recovery increases. Approximately 3% of the firm's agreements provided for a decreasing percentage as the recovery increases. Some of those agreements are with public entities where a decreasing percentage is mandated by statute. The firm has some stage-of-case arrangements that top out at 33.3% of the recovery.

- A third firm collected and reviewed 210 *ex ante* fee agreements, constituting 23% of the firm's contingent fee agreements during the past five years. Approximately 88% provided for flat percentage regardless of magnitude. Approximately 86% provided for a fee recovery of 25% of higher. Approximately 36% provided for a fee recovery greater than the base award in this case. Approximately 9.5% provided for an increasing percentage. Approximately 2.5% provided for a decreasing percentage.

- A fourth firm collected and reviewed 43 *ex ante* fee agreements, constituting all of the firm's contingent fee agreements during the past five years. All of the agreements permitted the firm to apply for a court-approved award up to a cap of 30% or 33.3% of the total amount of funds received. Eight agreements provided for the 30% cap. The remainder provided for the 33.3% cap. The firm did not have any *ex ante* fee agreements providing for increasing percentages or decreasing percentages.

57

- A fifth firm does not generally use *ex ante* engagement letters and had negotiated only one during the past five years. It provided for a flat recovery of 25%.

The agreements that plaintiff's counsel provided for *in camera* review demonstrate that when they negotiate *ex ante* fee agreements with private clients, they consistently enter into arrangements that support the indicative fee in this case. The *ex ante* fee agreements provide persuasive evidence against any downward reduction.

The objectors collected fee applications from federal securities actions, including actions in which some of plaintiff's counsel were involved, and those applications sought fee awards consistent with the general trends in federal securities actions. Just as the evidence about the use of the declining-percentage methodology in federal securities cases is not persuasive for purposes of this action, the illustrative fee requests and fee agreements that the objectors collected are not persuasive.

### d.    The Irony Of The Objectors Arguing For A Declining Percentage

So far, this decision has identified strong reasons for rejecting the declining-percentage method. There is also a particular irony in *who* is arguing for that method, because as fund managers, the objectors do not use similar arrangements. The objectors do, however, engage in litigation, yet they declined to do so in this case. The objectors' arguments therefore come with ill grace.

The objectors concede that the incentive fee arrangements that they have as fund managers do not contemplate a decreasing percentage as fund gain increases. They also concede that no one in the investment industry uses a decreasing-percentage model.

Investors and fund managers thus universally opt for an incentive fee arrangement that scales with the size of the return and does not decline. The general takeaway is that the market for highly trained professionals who use symbolic reasoning based primarily on numbers and secondarily on words to identify opportunities and generate risk-based returns (*i.e.*, financial professionals) does not use incentive-based compensation arrangements in which percentages decline as the amount of the gain increases. The same should be true in the market for highly trained professionals who use symbolic reasoning based on primarily words and secondarily on numbers to identify opportunities and generate risk-based returns (*i.e.*, financially savvy lawyers).

Not surprisingly, the objectors argue that their compensation arrangements as fund managers are not relevant, and the professors join in that effort. Their main point is that fund manager agreements are negotiated, and investors can decide whether they want to invest. No similar negotiations took place here, nor is there an opt-out opportunity.

The lack of negotiation is not a distinction. It is the reason why the court is looking to other sources in the first place. The absence of an *ex ante* agreement is what forces the court to consider other sources of market evidence, like the objectors' compensation arrangements.

More aptly, the objectors observe that their compensation arrangements as fund managers contain features designed to reward above-market performance and incorporate past losses. The first issue is addressed through a hurdle rate, which only permits a fund manager to earn performance fees above a specified percentage, sometimes tied to a benchmark index. The second issue is addressed through a loss carryforward, which only

entitles the fund manager to receive performance fees on profits in excess of the highest value that an investor's account has reached. But those issues and their solutions are not unique to fund managers; they apply to any contingently compensated professional. An engagement letter could include a hurdle that would pay counsel only if the lawsuit generated a recovery that exceeded a certain level. And if a client employed counsel across multiple matters, the engagement letter could include a loss carryforward. What distinguishes a court-awarded contingent fee from a fund management arrangement is that the award is a one-off payment, determined after the fact.

The objectors also try to distinguish their compensation arrangements as fund managers on the theory that they receive performance fees on gains, not on invested capital. The objectors then assert "awarding class counsel a straight-percentage of the entire settlement fund would be akin to an investment manager earning a performance fee on the entire value of an investor's initial investment." Suppl. Obj. at 14. That is wrong. The value of the initial investment here is not the settlement, but the $20.7 billion in value that the class received at closing. Applying a fund manager's 20% performance fee to the $1 billion settlement would result in a performance fee of $200 million. That is less than the $266.7 million that plaintiffs' counsel stand to receive here, but it is only part of the story. In the interim, as fund managers, the objectors would have received a management fee on all of the invested capital, which makes their business model more lucrative and less risky than contingency fee work. A management fee of 2% on the $20.7 billion would have generated another $414 million in fees. And that is without taking into account the different tax treatment afforded to the carried interest that generates the investment manger's

60

performance fee. Relative to how the objectors are compensated, plaintiff's counsel are undercompensated.

The objectors are thus not well positioned to insist on a declining-percentage method given that they do not use it in their own risk-based businesses. The objectors are also not well positioned to object to the fee application because the objectors could have stepped up and chose not to. All are sophisticated funds. All are highly litigious. Any of them could have hired counsel, negotiated a fee arrangement, and pursued this case. None did. They decided to free ride, then only roused themselves after the $1 billion settlement had been achieved. At that point, they did not object to the settlement itself, nor did they offer to take over the case on the theory that they and their own handpicked counsel could do better. They were content to snipe at the fee.

The settlement was a windfall for the objectors because they did nothing to create it. Two of the objectors signed agreements to support the transaction (Canyon and Dodge & Cox). Another touted its benefits. It was the plaintiff and its counsel that pursued the litigation and generated the results.

Having sat back and done nothing, the objectors now claim that a fee award without a sizable reduction would "not yield equitable results." Obj. at 2. That assertion masks self-interest with an appeal to equity. Wanting more money for yourself is understandable, but

it is not grounds for a fee objection. As Chief Justice Strine often observed while serving on this court, envy is not a sound basis for reducing a fee award.[29]

### e.        The Not-As-Good-As-It-Seems Argument

As a final argument for a lower percentage, the objectors maintain that the settlement is not as good as it seems. They admit that $1 billion is a big number, but they say the outcome is not so impressive given (i) the likelihood of success, (ii) the settlement's value relative to the maximum possible damages, and (iii) the settlement's value as a percentage of transaction value. None of those arguments are persuasive.

Let's start with the basics. The common fund that plaintiff's counsel created is the largest class recovery ever obtained by nearly a factor of four. The next largest class recovery is *Activision* at $275 million. The common fund exceeds all of the settlements

---

[29] *Clear Channel*, *supra*, tr. at *19 ("We don't build fees on envy because there are cases where people get something that sounds like the salary of a former Chicago Bears linebacker for their efforts."); *S. Peru*, *supra*, tr. at 82 ("[T]o me, envy is not an appropriate motivation to take into account when you set an attorney fee. It's not. I'm sure that people will envy the law firms who get awarded this fee. They have to defend this appeal. They had to win it. But that's not rational. We're setting a system here. And if envy was the rule, then, again, I think the real windfall cases I talked about before is where the real envy comes in, where people do nothing or close to nothing and fees are awarded. Those are the cases in our society where we have to be, I think, more careful."); *see also Forgo*, *supra*, tr. at 81 ("I don't believe, when I look at this, that I'm awarding a lower fee in *Alberto-Culver*. That is not what I'm trying to say, lest anyone get a hurt feeling or lest anyone say, 'Hey, . . . the Court loved us more in *Alberto-Culver* than they loved you in *Health Grades*.' That's when I just have a fundamentally different way of looking at it, which is because there's a whole other way of saying, 'Well, actually Chancellor Strine awarded a higher hourly rate to the lawyers in *Health Grades* and compensated their efforts more. And so he actually valued what they did higher.'").

from entire fairness cases over the last decade and nearly exceeds all of the settlements in both entire fairness and enhanced scrutiny cases.

With one exception, the $1 billion recovery is the largest that any representative lawsuit has ever achieved in this court. The lone competitor is the $1.9 billion judgment in *Southern Peru*, which consisted of $1.347 billion in damages plus pre-judgment interest. *See* 52 A.3d at 819. That judgment, however, did not involve cash, and it did not inure only to an injured class. The plaintiffs sued derivatively on behalf of a majority-owned subsidiary (Southern Peru) to challenge a transaction between Southern Peru and its parent (Minera Mexico). Minera Mexico was itself a controlled corporation, and the ultimate controller (Grupo Mexico) caused Southern Peru to acquire Minera Mexico in a stock-for-stock deal. The court found that the exchange rate resulted in Southern Peru overpaying and issuing too much stock. Although the judgment was framed as a cash recovery, the court permitted Grupo Mexico to satisfy the judgment by returning excess shares, so there was no cash outlay. After the transaction, Grupo Mexico held an 81% interest in Southern Peru, and Grupo Mexico benefited from the recovery to that extent. If, for example, Southern Peru had distributed the returned shares as a dividend, then $1.539 billion in value would have gone to Grupo Mexico and only $351 million to the minority stockholders. Here, only the unaffiliated DVMT stockholders will benefit from the $1 billion common fund. The defendants and their affiliates are excluded from the class.

The objectors next argue that the $1 billion common fund is not so impressive because plaintiff's counsel had a high likelihood of prevailing at trial. They say that the

combination of the entire fairness test plus as-pled flaws in the deal process meant that "liability was seriously contested but never seriously in doubt." Obj. at 12.

No one who is actually familiar with litigation in this court could think that. "A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001). As discussed previously, defendants regularly prevail at trial under the entire fairness test. Plaintiff's counsel did not have a laydown hand on liability. They had a strong case that the fiduciary defendants did not follow a fair process, but fair price was debatable, and damages were a wildcard. If this court or the Delaware Supreme Court concluded that the defendants had proved that the price was sufficiently fair to carry their burden on entire fairness, then the class would lose.

The objectors also complain that the class is receiving a relatively small percentage of the maximum potential damages. The plaintiff argued for damages of $10.7 billion, equal to the difference in value between what the class gave up (DVMT stock valued at $158.38 per share for a total of $31.5 billion) and what the class received (cash plus Class C stock valued at $104.27 per share for a total of $20.8 billion). The objectors say confidently that the damages award "was based on simple arithmetic" and "is well supported by expert analyses." Obj. at 12. They criticize the plaintiff for settling for only 9.3% of the maximum potential recovery.

The question of fair price and the magnitude of any recovery would have come down to a battle of the experts. The outcome was particularly unpredictable given the novelty of the DVMT tracking stock and the plaintiff's damages theories. Evidencing the

importance of these issues, the parties collectively devoted nearly forty pages in their pre-trial briefs to fair price and damages, drawing extensively from the experts' reports and depositions. Both sides proffered well-respected experts who took parallel approaches but reached diametrically opposite conclusions.

In their briefs, plaintiff's counsel explained persuasively why this court or the Delaware Supreme Court might reject their top-end damages figure entirely or discount the computation. To obtain the full amount, both this court and the Delaware Supreme Court would have had to believe that the Company's credit risk was nearly zero and that virtually all of the DVMT discount was attributable to the controllers. Yet the Company had a highly leveraged, non-investment grade balance sheet, and virtually every tracking stock in history has traded at a meaningful discount, albeit less than DVMT. Investors contemporaneously attributed some of the DVMT discount to credit risk and a conglomerate discount.

To reach $10.7 billion, the plaintiffs would have needed to pitch a perfect game at trial, then repeat that performance on appeal. Assuming the plaintiff had a one-in-five chance of success, then the risk-adjusted recovery would fall to $2.14 billion, and the settlement would represent 46.7% of the likely damages. If liability was a toss-up, then the risk-adjusted damages recovery would fall to $5.35 billion, and the settlement would represent 18.69% of the likely damages. And recall that the Delaware Supreme Court has not affirmed a monetary recovery for a representative plaintiff since 2016. Might a one-in-five estimate, or an even-money chance be putting the odds a bit high?

Recognizing that the $10.7 billion represented a swing for the fences, plaintiff's counsel presented alternative remedies that would support damages between $400 million

and $3.1 billion. Those alternatives were tied to contemporaneous evidence and to issues on which the experts agreed. The objectors cannot fathom why those alternative scenarios would be more plausible, but any experienced litigator would perceive why: They are based on what the parties thought at the time, rather than after-the-fact expert opinions, and they produce recoveries that remain stratospheric, but which are far less than the out-of-this-world figure of $10.7 billion. In this court, when plaintiffs prevail, they rarely receive their full requested damages.[30]

When deciding to accept a settlement equal to 9.35% of the maximum possible damages, plaintiff's counsel understandably placed greater weight on the alternative recoveries and discounted heavily the prospect that the court would enter what would be the largest class action judgment in Delaware history by more than an order of magnitude *and* that such a judgment would withstand appeal. If this court or the Delaware Supreme Court rejected any of the core premises of the plaintiff's valuation theories, then any damages recovery could have been significantly reduced or eliminated or the defendants might succeed in proving entire fairness (by demonstrating that the price was sufficiently fair to overcome any process problems).

---

[30] *See, e.g.*, *In re Columbia Pipeline Gp., Merger Litig.*, --- A.3d ----, 2023 WL 4307699, at *5–6 (Del. Ch. June 30, 2023) (awarding economic damages of $1 per share where "plaintiffs sought rescissory damages of $3.032 billion with no alternative damages theory"); *Mindbody*, 2023 WL 2518149, at *45–47 (awarding $1 per share in damages where plaintiffs sought damages "of $3.50 per share and quasi-appraisal damages for their disclosure claim in the amount of $5.75 per share"); *Vianix Del. LLC v. Nuance Commc'ns, Inc.*, 2010 WL 3221898 (Del. Ch. Aug. 13, 2010) (noting that the plaintiff "recover[ed] what may be millions of dollars in damages, but far less than it claimed").

When approving the settlement, the court found that the common fund reflects an "exceptional result" of approximately 5% of equity value and that "the settlement consideration of $1 billion represents a substantial fraction of the likely recoverable damages." Dkt. 536 at 41. Those observations remain true.

Plaintiff's counsel also demonstrated that the settlement reflected a reasonable percentage of the maximum damages sought when compared to precedent settlements. The calculations are difficult, because reliable public data concerning maximum damages is unavailable. Many cases settle before expert reports are submitted, leaving only the less-precise allegations in pleadings or briefing. Even when the parties have submitted expert reports, references to the quantum of alleged damages are often redacted. Settlement briefs and transcripts of settlement hearings are often unhelpful, because when presenting a settlement to the court, counsel seldom mentions the maximum possible damages, focusing instead on the more plausible, risk-adjusted recoveries. That makes the settlement sound better, and it reflects how the court evaluates the settlement. A court should know what plaintiff's counsel thought their best day would bring, but the real test is what the settlement achieves relative to the risk-adjusted value of the case.

To compare the settlement in this case with precedents, this decision again turns to the twenty-four settlements in deal cases after *Americas Mining* where entire fairness would apply. Plaintiff's counsel could not generate reliable estimates of maximum possible damages for two of the settlements (*TD Bank* and *Calamos*). Plaintiff's counsel did not include the post-trial settlement in *In re Dole Food Co., Inc. Stockholders Litig.*, 110 A.3d

1257 (Del. Ch. 2015). As noted previously, eight of the settlements involved transactions valued at less than $100 million, and the court excludes them.

That leaves fourteen precedents. The deal values range from $156 million (*Homefed*) to $7.4 billion (*Malone*). The mean deal value is $1.785 billion; the median is $1.042 billion. The mean settlement is $43.65 million, and the median is $42.60 million. The precedent transactions are materially smaller in absolute size, averaging less than 10% of the $23.9 billion deal in this case. The gross settlement funds are also materially smaller in terms of absolute size, averaging less than 5% of the settlement achieved in this case. Yet the values as a percentage of maximum damages are much higher, with a mean of 34.34% and a median 16.5%. Those figures are driven upward by outlier results in *GFI Group* ($10.75 million; 176.23%) and *Delphi* ($49 million; 89%), plus three other settlements that involved recoveries of 30% or higher: *AVX* ($49 million; 41.58%); *Malone* ($110 million; 38.19%); and *Starz* ($92 million; 38.07%).

Excluding the two high-end outliers (*GFI* at 176% and *Delphi* at 89%) lowers the mean recovery to 17.95% and the median to 12.35%. Excluding the two high-end outliers and the two low-end outliers (*Straight Path* at 1.13% and *Venoco* at 5.3%) results in the mean recovery increasing to 20.91% and a median recovery staying at 16.5%.

If added to the sample and evaluated as a percentage of claimed maximum damages, the settlement in this case would rank eleventh. The full list appears below:

| # | Settlement | Transaction Value (in millions) | Settlement Value (in millions) | As % of Max Damages |
|---|---|---|---|---|
| 1 | GFI Group | $366.00 | $10.75 | 176.23% |
| 2 | Delphi | $2,500.00 | $49.00 | 89.00% |
| 3 | AVX | $1,030.00 | $49.90 | 41.58% |

| | | | | |
|---|---|---|---|---|
| 4 | Malone | $7,400.00 | $110.00 | 38.19% |
| 5 | Starz | $4,400.00 | $92.50 | 38.07% |
| 6 | Homefed | $156.00 | $15.00 | 19.80% |
| 7 | CNX Gas | $605.88 | $42.70 | 19.00% |
| 8 | Alon USA Energy | $407.00 | $44.75 | 14.00% |
| 9 | Jefferies | $2,400.00 | $70.00 | 10.70% |
| 10 | Akcea | $446.50 | $12.50 | 9.53% |
| *11* | *Dell Class V* | *$23,900.00* | *$1,000.00* | *9.34%* |
| 12 | Amtrust | $1,040.00 | $40.00 | 9.20% |
| 13 | Pivotal | $1,430.00 | $42.50 | 9.00% |
| 14 | Venoco | $363.00 | $19.00 | 5.30% |
| 15 | Straight Path | $2,450.00 | $12.50 | 1.13% |
| | Mean (Ex. Dell) | $1,785.31 | $43.65 | 34.34% |
| | Median (Ex. Dell) | $1,035.00 | $42.60 | 16.50% |

I was surprised by the wide variation across outcomes. I suspect that it would require a deeper dive into the settlements to unpack the result. All involve M&A cases, but some of the plaintiffs may have pursued different damages theories. I also suspect that it is easier for a plaintiff to achieve a relatively high percentage recovery in a case where the claimed damages are less than $100 million. The cost to defend an entire fairness case through trial can be high. I would guess conservatively at figures between $10 million and $30 million depending on the number of defendants and firms involved, the hourly rates of the defense lawyers, and the cost of the experts.[31] Settlements at or below that level may present defendants (or their insurers) with an attractive way to mitigate risk. As the dollar value of the settlement gets higher, it becomes more difficult to rationalize a settlement as money that would have been spent anyway. It is also notable that six of the fourteen settlements

---

[31] In *Mindbody*, plaintiff's counsel represented that the defendants had exhausted a $40 million insurance tower before trial began. *See Mindbody*, *supra*, tr. at 8.

land in the vicinity of $45 million, which could be a sweet spot that takes into account the defense costs that the settlement saves plus something for the elimination of risk.

A less noisy proxy for the strength of a settlement in an M&A case is the magnitude of the recovery as a percentage of the equity value of the transaction. This analysis considers the same sample of entire fairness cases and excludes transactions with a value of $100 million or less. There are fifteen precedents, because the deal size for *TD Bank* is known. The list provided by plaintiff's counsel does not include the settlement in *Dole*, which this decision adds.

This time, deal value ranges from $156 million (*Homefed*) to $26 billion (*TD Bank*). The mean transaction value is $3.26 billion; the median is $1.12 billion. The mean settlement value is $49.43 million, and the median is $42.6 million. Measured as a percentage of the transaction value, the mean settlement value is 4.47% and the median is 2.95%. There is a considerably tighter spread across the dataset.

The settlement in this case is 4.18% of deal value. That puts it just below the mean and above the median for that metric. Strikingly, the settlement in this case dwarfs the only precedent involving a deal of comparable size—*TD Bank* at $26 billion—where a settlement of $31.5 million reflected only 0.12% of deal value. If added to the sample, the settlement in this case ranks seventh. The full list appears below:

| # | Settlement | Transaction Value (in millions) | Settlement Value (in millions) | As % of Equity Value of Deal |
|---|---|---|---|---|
| 1 | Dole | $1,210.00 | $148.20 | 12.24% |
| 2 | Alon USA Energy | $407.00 | $44.75 | 11.00% |
| 3 | Homefed | $156.00 | $15.00 | 9.60% |

| | | | | |
|---|---|---|---|---|
| 4 | CNX Gas | $605.88 | $42.70 | 7.20% |
| 5 | Venoco | $363.00 | $19.00 | 5.20% |
| 6 | AVX | $1,030.00 | $49.90 | 4.80% |
| *7* | *Dell Class V* | *$23,900.00* | *$1,000.00* | *4.18%* |
| 8 | Amtrust | $1,040.00 | $40.00 | 3.80% |
| 9 | Pivotal | $1,430.00 | $42.50 | 3.00% |
| 10 | Jefferies | $2,400.00 | $70.00 | 2.90% |
| 11 | Akcea | $446.50 | $12.50 | 2.80% |
| 12 | GFI Group | $366.00 | $10.75 | 2.79% |
| 13 | Starz | $4,400.00 | $92.50 | 2.10% |
| 14 | Delphi | $2,500.00 | $49.00 | 2.00% |
| 15 | Malone | $7,400.00 | $110.00 | 1.49% |
| 16 | Straight Path | $2,450.00 | $12.50 | 0.51% |
| 17 | TD Bank | $26,000.00 | $31.50 | 0.12% |
| | Mean (Ex. Dell) | $3,262.77 | $49.43 | 4.47% |
| | Median (Ex. Dell) | $1,125.00 | $42.60 | 2.95% |

As the court found when approving the settlement, plaintiff's counsel achieved an excellent outcome. The objectors are correct to point out that what plaintiff's counsel achieved is not as impressive when measured as a percentage of maximum damages claimed, but that is a noisy indicator. They are also correct that the settlement looks more typical when considered as a percentage of deal value, rather than in absolute terms. But the precedents also show that plaintiff's counsel in M&A cases are obtaining low-to-mid eight-figure recoveries. There have been only two nine-figure recoveries, one of $110 million and another of $148.2 million. No one has previously obtained a ten-figure recovery. Plaintiffs' counsel are thus generally hitting singles and doubles, with two triples. This is the first home run.

To the extent the objectors think that the court should discount the $1 billion settlement because the defendants were likely to pay a big amount, the court has a different

71

view. Plaintiff's counsel achieved an unprecedented result and deserve the full percentage that the stage-of-case method supports.

## 2. The Extent To Which The Fee Was Contingent On Results

The lengthy discussion so far has only calculated an indicative fee using the first *Sugarland* factor: the results caused by the litigation. Fortunately, the analysis of the remaining factors is straightforward.

The next factor to be considered is the extent to which counsel's compensation was contingent on the result. *Activision*, 124 A.3d at 1072. It is the "public policy of Delaware to reward risk-taking in the interests of shareholders." *Plains Res.*, 2005 WL 332811, at *6. Accepting contingency risk is what enables counsel to receive an award based on the results generated by the litigation that exceeds their lodestar. When counsel does not litigate on contingency, then counsel cannot receive more than their actual billings and expenses, and if the results-based award under *Sugarland* calls for less, then they receive less. A full contingency fee arrangement is not required. A hybrid fee arrangement could generate a hybrid result.

Here, plaintiff's counsel litigated on a fully contingent basis. If they lost, they would get nothing. They also were responsible for funding their expenses. Plaintiff's counsel are therefore entitled to a results-based fee based on the *Sugarland* factors.

That said, "[n]ot all contingent cases involve the same level of contingency risk." *Activision*, 124 A.3d at 1073. During the litigation epidemic, lawyers filed cases and sought expedited pre-closing injunctive relief in a setting where the desire to close the transaction put pressure on the defendants and there was a ready-made settlement opportunity that took

72

the form of the issuance of supplemental disclosures. *See Orchard*, 2014 WL 4181912, at *9. Those cases did not involve real contingency risk.

This case involved true contingency risk. Plaintiff's counsel did not enter the case with a ready-made exit or obvious settlement opportunity. There was a serious possibility that plaintiff's counsel would lose and receive nothing.

The true contingency risk in this case supports a results-based award using the *Americas Mining* percentages. No downward reduction is warranted under this factor.

### 3. The Time And Effort Of Counsel

The next factor to consider is the time and effort expended by counsel. This factor serves as a cross-check on the reasonableness of a fee award. It has two separate but related components: (i) time and (ii) effort. *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011).

Based on the discussion in the prior section, plaintiff's counsel is entitled to an indicative fee equal to 26.67% of the benefit, for an award of $266.7 million. Plaintiff's counsel spent 53,000 hours litigating this case. According to counsel's affidavits, the value of the time incurred at customary rates would be $39,431,415.50. The indicative award represents a multiplier of seven times lodestar and an implied rate of approximately $5,000 per hour. Neither is excessive under this court's precedents.

"The more important aspect is effort, as in what plaintiffs' counsel actually did." *Id.* at 1139. "When an entrepreneurial plaintiffs' firm engages in adversarial discovery, obtains documents from third parties, pursues motions to compel, and litigates merits-oriented

issues, they are likely representing the interests of the class." *Id.* The outcome here resulted from significant effort.

The effort that plaintiff's counsel put in began with the filing of a Section 220 demand. That demand enabled plaintiff's counsel to obtain books and records and prepare a strong complaint that survived a motion to dismiss. Considerable effort was necessary, because the transaction had been designed so that on the surface it would meet the requirements of *MFW* and be protected by an irrebuttable version of the business judgment rule. Plaintiff's counsel adeptly advanced arguments to negate the *MFW* structure and create a pleading-stage inference that the entire fairness test would govern the transaction.

After the ruling on the motion to dismiss, an army of skilled defense counsel fought the plaintiffs at every turn. The defendants retained a phalanx of high-powered attorneys from Alston & Bird LLP; Simpson Thacher & Bartlett LLP; Latham & Watkins LLP; Wachtell, Lipton, Rosen & Katz LLP; Williams & Connolly LLP; Abrams & Bayliss LLP; Richards, Layton & Finger, P.A.; and Young Conaway Stargatt & Taylor, LLP. Later in the lawsuit, after Goldman was added as a defendant, Skadden, Arps, Slate, Meagher & Flom LLP joined the mix. Nearly 100 lawyers from those firms entered appearances.

Between June 2020 and March 2022, plaintiff's counsel propounded sixty-six document requests, 710 interrogatories, and 179 requests for admission to the defendants. Plaintiff's counsel also served forty-one non-party subpoenas.

Through these efforts, plaintiff's counsel developed an extensive record that included nearly 2.9 million pages of documents from over forty parties and non-parties.

74

Plaintiff's counsel took thirty-two fact depositions, four of which lasted two days. Plaintiff's counsel also responded to the defendants' expansive discovery demands.

Expert discovery followed. The plaintiff hired one testifying expert. The defendants hired two. The experts served lengthy opening and rebuttal reports and sat for depositions.

As noted, the case did not settle until nineteen calendar days before trial. By that point, the parties had prepared and filed a joint pre-trial order. They had also filed lengthy pre-trial briefs.

In federal securities cases, concern exists that after surviving a motion to dismiss in a case that seems likely to support a large settlement, plaintiff's counsel will not settle promptly because their lodestar will be too low to support an adequate fee. Instead, plaintiff's counsel works the case, churning hours on document review and possibly a handful of depositions to generate the lodestar necessary to make a big fee award plausible. *See* Stephen J. Choi et al., *Working Hard or Making Work? Plaintiffs' Attorneys Fees in Securities Fraud Class Actions*, 17 J. Empirical Legal Stud. 438, 464 (2020). Nothing like that happened here. After surviving the motion to dismiss, plaintiff's counsel engaged in real work and prepared the case for trial. Mediation did not take place until after fact and expert discovery had concluded. The mediation was initially unsuccessful, and plaintiff's counsel continued to prepare the case for trial.

The time and effort expended by counsel supports the indicative award.

### 4. The Complexity Of The Litigation

"One of the secondary *Sugarland* factors is the complexity of the litigation. All else equal, litigation that is challenging and complex supports a higher fee award." *Activision*, 124 A.3d at 1072.

This case was challenging and complex. The preceding section discusses the extensive discovery that plaintiff's counsel pursued to make the settlement a reality. Fact discovery included multiple third parties, and it involved spoliation issues.

Expert discovery was also challenging. Plaintiff's counsel had to work with their expert to develop novel valuation approaches for a transaction involving a one-of-a-kind tracking stock (DVMT), another complex security (VMware common stock), and a privately held company (Dell). Plaintiff's counsel also had to analyze complicated tax issues, alternative transactions like a forced conversion, and novel questions about market expectations and minority discounts.

The complexity of the litigation supports the indicative award.

### 5. The Standing And Ability Of Counsel

"Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'" *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *9 (Del. Ch. Dec. 31, 2010) (quoting *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 956 (Del. Ch. 2010)). Scholars have found that the involvement of a top-tier firm makes a difference for case outcomes in Chancery M&A litigation, although they have been unable to unpack the endogeneity problem and differentiate between selection effects versus an actual positive contribution. *See* Alan B. Badawi & David W. Webber, *Does the Quality*

76

*of the Plaintiffs' Law Firm Matter in Deal Litigation?*, 41 J. Corp. L. 359, 390–91 (2015).

My intuitive answer is "both." Clearly, case selection matters, but the difference in what a top plaintiff's firm brings to a case is obvious.

Plaintiff's counsel included experienced stockholder advocates who have taken multiple cases through trial and appeal. This factor supports the indicative award.

### 6. Should The Percentage Be Adjusted Because It Was Not Paid Separately?

Last, the objectors criticize plaintiff's counsel for not structuring the settlement to provide for a fixed recovery to the class and for the defendants to pay the attorneys' fee award separately. The objectors contend that the court prefers that approach, and they imply that the court should reduce the fee to reflect the parties' failure to acknowledge that preference. This judge does not have such a preference, and under the *Americas Mining* framework, framing a settlement that way simply means that I have to do more math.

This court has traditionally calculated fee awards as a percentage of a gross common fund. The *Americas Mining* percentages are framed that way. That is the general method that courts have long used.[32]

---

[32] The concept of awarding a fee out of the common fund and not in addition to the common fund dates back to the nineteenth century. *See Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 125, 128 (1885) (awarding fee out of amounts recovered on behalf of a class of unsecured creditors; calculating fee as a percentage of the amount recovered); *Trustees v. Greenough*, 105 U.S. 527, 532 (1881) (awarding fee out of amounts recovered on behalf of a class of bondholders; reimbursing plaintiff from fund for amounts paid to counsel); *id.* at 534–35 (citing earlier cases). "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

The only post-*Americas Mining* case that the objectors rely on for the side-payment theory is *Jefferies*. There, the parties settled on a common fund of $70 million in cash. The defendants agreed to pay the fee separately and reserved the right to oppose any application. The parties failed to reach agreement, and the plaintiffs sought $27.5 million plus expenses of $1 million. The plaintiffs pitched this request as an implied gross fund of $100 million from which they would recover a fee of approximately 27.5%. The defendants argued that a fee should be calculated using the recovery of $70 million and a percentage of 22.5%, resulting in an award of $15.75 million. *Jefferies*, 2015 WL 3540662, at *2.

In a footnote, the court noted that it was helpful to have adversarial briefing on the fee award. The court also noted that the adversarial briefing likely happened because the parties agreed to have the fee paid separately. *Id.* at *2 n.5. That meant the defendants' total outlay was not capped by the common fund, and they had an incentive to resist the fee. The court observed that "[f]rom a policy perspective, it would be beneficial in my view for fee applications to be subject to adversarial inquiry to provide the Court with a better record with which to evaluate the *Sugarland* factors." *Id.* The objectors cite this passage, but they incorrectly translate a comment about the benefits of adversarial briefing into an endorsement of separately paid fee awards.

---

"Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.* The fees are assessed against the entire fund and paid out of the fund, not in addition to the fund. *See id.*; *accord Goodrich*, 681 A.2d at 1045 ("[T]he common fund doctrine permits an attorney to independently request an award of fees from that same settlement fund.").

If everyone paid fees separately, then it would be easy to compare fee awards across settlements. But when precedents like *Americas Mining* refer to fees as a percentage of a gross fund, then an agreement by the defendants to pay the fee separately means that the court has to convert that structure into the *Americas Mining* format. The commitment to pay the fee separately operates as an additional form of consideration. The resulting benefit is not just the fund, but rather the fund plus whatever amount the court awards in settlement.

A common fund with a fee award paid separately is mathematically equivalent to a larger common fund with a lower percentage fee award coming out of the gross amount. The *Jefferies* case illustrates this. The court ultimately awarded a fee of $21.5 million, inclusive of expenses, which it described as "approximately 23.5% of the gross value (approximately $91.5 million) of the settlement." *Id.* at *4. The court thus recognized that the side payment of the fee increased the gross amount of the settlement, viewed the gross amount as $91.5 million, and viewed the fee award as 23.5% of that gross amount.

The same equivalency operates when parties negotiate a settlement, which enables parties to convert an impasse over the gross amount of the settlement into an agreement on a gross amount plus a dispute over a fee award. The defendants' all-in proposal to the court in *Jefferies* equated to a total outlay of $85.75 million ($70 million to the class plus $15.75 million to counsel). The plaintiffs' all-in proposal in *Jefferies* equated to a total outlay of $100 million ($70 million to the class plus $27.5 million plus expenses to counsel). It is easy to envision that the parties initially bargained on those terms but could not bridge the delta between $85 million and $100 million. The solution was to agree on a net amount,

79

then fight over the fee. The court effectively determined that the right price for the settlement was $91.5 million.

Under Delaware law, parties must agree to the settlement consideration first, before turning to the fee award. The *Jefferies* decision correctly observes that in that setting, the defendants have already capped their total exposure and have little incentive to fight about the fee percentage. That means there is a good public policy reason for separately paid fee awards. But there are other important policy interests, including encouraging settlement. The current method of deducting fees from the total amount serves that goal, precisely because defendants can assess their overall exposure. A standard in which separately paid awards were the norm could reduce settlement rates.

Regardless, to keep levels of compensation consistent, switching to separately paid awards would require reframing the *Americas Mining* ranges as lesser percentages of the implied gross fund. The following table provides them:

| Stage of Case | *Americas Mining* Percentage | Paid Separately Percentage |
|---|---|---|
| Early | 10% to 15% | 9% to 13% |
| Mid | 20% to 25% | 16% to 20% |
| Late | 25% to 30% | 20% to 23% |
| Max | 33% | 25% |

Unless those adjustments are made, using the *Americas Mining* percentages for a separately paid award simply gives plaintiff's counsel a raise.[33]

Under current law, there is no basis for criticizing the parties for structuring their settlement as they did. The court will award a fee as a percentage of the gross fund.

### 7. The Overall Conclusion

The *Sugarland* factors support a fee award of $266,700,000. The stage-of-case method endorsed by *Americas Mining* calls for a percentage equal to 26.67% of the benefit caused by the litigation. Grounds do not exist to reduce the award in this case in light of the size of the common fund. The other *Sugarland* factors fully support the award.

### B. Out-Of-Pocket Costs

A recurring issue when ruling on fee applications is whether to make an all-in award or to approve a separate reimbursement of out-of-pocket costs.[34] When plaintiff's counsel

---

[33] The following table provides illustrative calculations. The general formula is as follows: Equivalent Percentage of Larger Fund = Fee Award / (Common Fund + Fee Award).

| Common Fund | *Americas Mining* Percentage | Fee Award | Equivalent Larger Fund | Equivalent Percentage of Larger Fund |
|---|---|---|---|---|
| $10 million | 10% | $1 million | $11 million | 9% |
| $10 million | 15% | $1.15 million | $11.5 million | 13% |
| $10 million | 20% | $2 million | $12 million | 16% |
| $10 million | 25% | $2.5 million | $12.5 million | 20% |
| $10 million | 33% | $3.3 million | $13.3 million | 24.8% |

[34] This decision uses the term "out-of-pocket costs" because seemingly simple terms like "expenses" and "costs" are confusing. On the one hand, the concept of "expenses" can

has pushed deep into the case, the generally optimal approach is reimbursement of out-of-pocket costs with the fee award calculated as a percentage of the net fund.

Court of Chancery decisions have taken a case-by-case approach to this issue. During the era of ritualized disclosure-only and *Cox Communications* settlements, the court expressed a preference for an all-in award. With cases settling early and routinely, an all-in award was easier for the court and encouraged counsel to be efficient. *See In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *33 & n.248 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012); *Telecorp PCS*, *supra*, tr. at 101.

When a plaintiff has engaged in real litigation efforts, then an all-in approach can generate unfairness by reducing the effective percentage of the award. The *Rural Metro*

---

encompass more than just out of pocket costs, as shown by Section 145 of the Delaware General Corporation Law. That section uses the term "expenses" to refer collectively both to attorneys' fees and amounts paid out of pocket. *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c) (mandating corporation to indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred"). On the other hand, the concept of "costs" can be narrower than any out-of-pocket costs, as shown by the statute which entitles a prevailing party to recover "costs." *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686–88 (Del. 2013). The term "out-of-pocket costs" seeks to bridge the gap by referring to all of the out-of-pocket costs and expenses, as opposed to attorneys' fees, that either a plaintiff or its counsel must incur to pursue a case.

litigation provides an example. Counsel settled with all but one defendant on the eve of trial for a gross settlement fund of $11.6 million. The out-of-pocket costs were $1.29 million, or 11% of the total. If plaintiff's counsel absorbed the out-of-pocket costs, then an all-in award of 30% of the gross settlement fund ($3.48 million) would equate after expenses to an effective award of 18.9%.

Recognizing that problem, some decisions have awarded a fee to counsel as a percentage of the gross fund, then awarded reimbursement of out-of-pocket costs on top of the fee award.[35] That method forces the class to bear all of the out-of-pocket costs from its share of the recovery. It has the opposite effect of an all-in award in that it increases the effective percentage that counsel receives and reduces the class's share. In an extreme case involving a small settlement, the combination could wipe out the class recovery altogether. Just as it is unfair to force counsel to internalize all out-of-pocket costs, it is unfair to put the class in a comparable position.

---

[35] *See, e.g.*, *In re TD Banknorth S'holders Litig.*, Cons. C.A. No. 2557, at 5 (Del. Ch. June 25, 2009) (ORDER) (awarding 27.5% of common fund in fees plus $964,086.61 in expenses); *Ryan v. Gifford*, 2009 WL 18143, at *13–14 (Del. Ch. Jan. 2, 2009) (awarding one-third of the monetary portion of the settlement in fees plus $398,100.79 in expenses); *In re Chaparral Res., Inc. S'holders Litig.*, Cons. C.A. No. 2001, at 4 (Del. Ch. Mar. 13, 2008) (ORDER) (awarding one-third of common fund in fees plus expenses of $1,089,298.10); *In re TeleCommunications, Inc. S'holders Litig.*, Cons. C.A. No. 16470, at 9, 13 (Del. Ch. Feb. 1, 2007) (TRANSCRIPT) (awarding 30% of the common fund in fees plus $827,658.91 in expenses); *In re Berkshire Realty Co., Inc. S'holder Litig.*, 2004 WL 5174889 (Del. Ch. Aug. 10, 2004) (ORDER) (awarding 30% of the common fund in fees plus $577,787.61 in expenses).

Some federal courts have resolved the dilemma by deducting out-of-pocket costs first, then awarding a percentage-based fee using the net award.[36] That approach treats the out-of-pocket costs as a higher priority debt claim, representing amounts paid to third parties necessary to generate the residual return. It treats counsel's fee percentage as a carried interest in the net recovery, with counsel participating *pari passu* with the class. The approach still encourages diligence in controlling out-of-pocket costs because "the lawyer and the client share the goal of maximizing the net recovery." *Immunex*, 864 F. Supp. at 145.

In a case where counsel have incurred significant out-of-pocket costs, the approach that best balances the interests of the attorneys and the class is to reimburse for out-of-pocket costs first, then award a fee based on a percentage of the net fund. Here, plaintiff's counsel pushed deep into the case and incurred $4,284,608.04 in out-of-pocket costs. If plaintiff's counsel had asked for out-of-pocket costs to be reimbursed, then the court would have deducted them first and awarded a fee as a percentage of the net benefit.

Why didn't plaintiff's counsel ask the court to reimburse out-of-pocket costs separately? If this case had generated a seven or eight-figure settlement, then plaintiff's counsel likely would have made the request. In this case, the common fund is so large that

---

[36] *See In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994); *Morganstein v. Esber*, 768 F. Supp. 725, 727–28 (C.D. Cal. 1991); *see also Lachance v. Harrington*, 965 F. Supp. 630, 648 (E.D. Pa. 1997).

the out-of-pocket costs become a rounding error. The real action is in the percentage awarded, with each percentage point worth $10 million.

Framing a request is a matter of judgment. Plaintiff's counsel could have been concerned about how a request for reimbursement might come across. When the fee award itself is so large, would it seem greedy to ask for out-of-pocket costs to be reimbursed separately? On the other hand, the optics of an all-in award might be helpful. If a request for an all-in award made it palatable for the court to approve an additional percentage point, then plaintiff's counsel would come out ahead by over $5.7 million—itself a decent fee award in many cases.

If I had to guess, plaintiff's counsel made the call that asking for an all-in award of 28.5% sounded better and could pay off in a larger bottom line amount. Because plaintiff's counsel asked for an all-in award, the court will not reimburse expenses separately. If plaintiff's counsel had asked for it, then this decision would have deducted out-of-pocket costs first, then calculated a fee based on a net award. As a practical matter, counsel's decision only cost them $3,141,903.08, reflecting the 73.33% share of the out-of-pocket costs that the class would have born. In the context of the fee award of $266.7 million, that is barely one-tenth of one percent—a rounding error.

## C.    The Incentive Award

Finally, plaintiff's counsel asks the court to approve an incentive award of $50,000 for the named plaintiff, to be paid out of the fee award, as restitution for the considerable time and effort the plaintiff devoted to this action. The Delaware Supreme Court has recognized that a class representative can receive an incentive fee based on (i) the time,

effort, and expertise expended by the class representative, and (ii) the benefit to the class. *Raider v. Sunderland*, 2006 WL 75310, at *1 (Del. Ch. Jan. 4, 2006), *cited in Isaacson v. Niedermayer*, 200 A.3d 1205, 1205 n.1 (Del. 2018).

Public policy favors incentive awards in appropriate circumstances: "Compensating the lead plaintiff for efforts expended is not only a rescissory measure returning certain lead plaintiffs to their position before the case was initiated, but an incentive to proceed with costly litigation (especially costly for an actively participating plaintiff) with uncertain outcomes." *Raider*, 2006 WL 75310, at *1. Scholars have provided sound reasons for the Delaware courts to move beyond purely restitution-oriented awards and for expanding, rather than restricting, the payment of incentive fees, albeit with criteria to minimize agency costs and avoid windfalls. *See* Charles R. Korsmo & Minor Myers, *Lead Plaintiff Incentives in Aggregate Litigation*, 72 Vand. L. Rev. 1923 (2019). Incentive awards are common in the federal courts, where scholars have expressed strong support for them, particularly when they reward sophisticated investors for performing a meaningful monitoring function and adding value for the class.[37]

---

[37] *See, e.g.*, Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1320 (2006); 5 William B. Rubenstein et al., *Newberg and Rubenstein on Class Actions* § 17:4, at 510–11 (6th ed. 2022), Westlaw (database updated June 2023). The exception is federal securities actions, where they are prohibited by statute. 15 U.S.C. § 78-u-4(a)(4). Scholars have criticized this prohibition as running contrary to the incentive structure crafted by the Private Securities Litigation Reform Act of 1995 and as having deleterious and unintended consequences for the role of sophisticated investors in supervising class actions. *See* Richard A. Nagreda, *Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards*, 53 UCLA L. Rev. 1483, 1491 (2006); Eisenberg & Miller, *supra*, at 1348; Charles Silver

A restitution-based award necessarily includes out-of-pocket costs, but it must go beyond that to fulfill its mission. A representative plaintiff must devote time to the litigation, and if that time has to be offered *gratis*, then the representative plaintiff effectively pays for taking on the role of class representative. Rather than receiving the same amount as the class, the named plaintiff receives less.

Nor is serving as a representative plaintiff an easy task. In the current litigation environment, a stockholder who files plenary litigation faces "the very real possibility of having their computer and other electronic devices imaged and searched, sitting for a deposition—perhaps more than one if they also institute [Section] 220 litigation—and then perhaps testify at trial." *Verma v. Costolo*, C.A. No. 2018-0509-PAF, at 52–53 (Del. Ch. July 27, 2021) (TRANSCRIPT); *accord Voigt v. Metcalf*, C.A. No. 2018-0828-JTL, at 44–45 (Del. Ch. Jan. 19, 2022) (TRANSCRIPT).

A named plaintiff also accepts reputational risk, as demonstrated by the fate of Herb Chen, the named plaintiff in *Chen v. Howard-Anderson,* 2017 WL 2842185 (Del. Ch. June 30, 2017). Professors Korsmo and Myers tell Chen's story well. *See* Korsmo & Myers, *supra*, at 1938–39. Chen was a securities analyst and professional investor who contributed significantly to the $35 million settlement that the class obtained. As one of the named plaintiffs, Chen was subjected to discovery and deposed. The defendants used the discovery to accuse Chen of trading on confidential information. Although both the court

<hr>

& Sam Dinkin, *Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions*, 57 DePaul L. Rev. 471, 481 (2008).

and the SEC cleared Chen of any charges, he incurred substantial expenses defending himself. The allegations ensnared another investor and the original named plaintiff, whom Chen regarded as his mentor, and destroyed their relationship. *See Steinhardt v. Howard-Anderson*, 2012 WL 29340 (Del. Ch. Jan. 6, 2012). Chen attested that media articles associated with the allegations had prevented him from finding another job on Wall Street. Korsmo & Myers, *supra*, at 1940.

The defendants used a similar playbook against the plaintiff in this case. Although the plaintiff is a pension fund that had no direct involvement in the transaction other than as a passive, outside investor that voted its shares and accepted the consideration, defense counsel pursued discovery from the plaintiff aggressively, serving forty-six document requests, 173 interrogatories, and fifty-nine requests for admission (excluding subparts). Defense counsel demanded that the plaintiff search for documents dating back to its origins as a pension fund and collect documents from multiple members of its board of trustees, even though they had no involvement in the DVMT investment or the litigation. In total, the plaintiff made ten separate document productions, comprising 48,620 pages. At defense counsel's request, the plaintiff provided three separate sets of supplemental or amended interrogatory responses. The defendants also served the plaintiff's outside asset managers and advisors with broad discovery demands. A representative of the plaintiff sat for a full-day deposition, as did a representative from one of its asset managers. Defense counsel did not turn up any evidence of the type of wrongdoing in *Chen v. Howard-Anderson*, but the scorched earth strategy was the same.

Delaware courts have approved meaningful incentive awards under similar circumstances.[38] The requested award of $50,000 is reasonable, even modest, given the time and effort that the plaintiff and its personnel expended to represent the class.

The requested award will be paid out of the fee award, so it does not reduce the recovery to the class. Paying an incentive award from the fee award is customary, and it recognizes that without a successful recovery, the named plaintiff is not entitled to an incentive award, just as plaintiff's counsel is not entitled to a fee. Treating the incentive award as part of the fee recognizes that plaintiff's counsel and the named plaintiff work as a team to pursue the litigation. *See Chen*, 2017 WL 2642185, at *2. The incentive award is "not so large as to raise specters of conflicts of interest or improper lawyer-client entanglements." *See Orchard*, 2014 WL 4181912, at *13.

---

[38] *See, e.g., In re El Paso Pipeline P'rs, L.P.*, 2016 WL 451320, at *2 (Del. Ch. Feb. 4, 2016) (ORDER) (incentive award of $450,000 to lead plaintiff); *Fox v. CDx Hldgs., Inc.*, 2015 WL 5163790, at *1 (Del. Ch. Sept. 2, 2015) (ORDER) (incentive award of $100,000 for named plaintiff who "risked his employment to step forward and challenge the treatment of the Class" and "braved the risk of adverse consequences resulting from his decision"); *Activision*, 124 A.3d at 1076–77 (approving award of $50,000 to lead plaintiff who "participated meaningfully in the case, sat for a deposition, and attended hearings and the mediation" and was "subjected to vigorous attacks throughout these proceedings, first by Hayes and his counsel during the leadership fight, next by defendants at the class certification phase, and now by both during the settlement phase"); *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2012 WL 1655538, at *8 (Del. Ch. May 9, 2012) (approving awards of $35,000, $20,000, and $7,500 for plaintiffs who gave depositions and other assistance); *Brinckerhoff*, 986 A.2d at 396 (approving payment of $100,000 to lead plaintiff who spent approximately 1,000 hours assisting with litigation); *Oliver v. Bos. Univ.*, 2009 WL 1515607, at *1 (Del. Ch. May 29, 2009) (awarding $40,000 to lead plaintiff where he spent approximately 2,000 hours assisting with litigation); *Raider*, 2006 WL 75310, at *2 (approving award of $42,000 for plaintiff who spent a total of 205 hours on litigation and incurred out-of-pocket expenses of $1,400).

### III.    CONCLUSION

Plaintiff's counsel is entitled to an all-in award of $266.7 million, representing 26.67% of the benefit caused by the litigation. Plaintiff's counsel will pay $50,000 of the fee award to the plaintiff as an incentive award.